Filed 5/4/18; pub. order 5/11/18 (see end of opn,)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ALYSIA WEBB, | D073449 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. RIC1605106) |
| CITY OF RIVERSIDE, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Riverside County, Sunshine S. Sykes, Judge.  Affirmed.


Law Offices of Raychele B. Sterling and Raychele B. Sterling, for Plaintiff and Appellant.

Gary G. Geuss, City Attorney, Susan D. Wilson, Assistant City Attorney; Colantuono, Highsmith & Whatley, Michael G. Colantuono and Ryan Thomas Dunn, for Defendant and Respondent.

Petitioner Alysia Webb[1] (Webb) filed a verified petition for writ of mandate in superior court alleging the City of Riverside (Riverside) violated Propositions 26 and 218 when it began transferring additional revenue from electric utility reserve fund accounts into the general fund without approval by the electorate. Webb contends the court improperly dismissed her case without leave to amend on a demurrer because the 120-day statute of limitations arising under Public Utilities Code section 10004.5[2] does not apply to her challenge of Riverside's change in calculation of its electric general fund transfer. She further contends the fund transfers constitute a tax increase because they alter the methodology used to calculate the amount of money Riverside transfers from the electric utility reserve to the general fund. We disagree and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Riverside operates Riverside Public Utilities (RPU), an electric utility created by the city charter. The charter allows Riverside to transfer annually up to 11.5 percent of RPU's gross operating revenues from its electric utility reserves to its general fund (electric general fund transfer) for use for general governmental purposes. The charter does not define "gross operating revenues" other than to state they must be "reported upon by independent public auditors."

---

[1] Richard Olquin was the original plaintiff in this matter. He passed away during the pendency of the suit, and the parties stipulated to the substitution of Alysia Webb. We have used Webb's name throughout our opinion.

[2] All statutory references are to the Public Utilities Code unless otherwise noted.

Riverside owns several high-voltage transmission lines that carry power outside the region. In 2002, Riverside transferred the operation of these lines to the California Independent System Operator (CAISO), but retained ownership.[3] CAISO collects transmission charges from other users of the grid using a formula rate approved by the FERC, and CAISO pays Riverside a TRR for use of the transmission lines. These TRR fees are generated from a wholesale revenue source, not Riverside ratepayers.

Though Riverside listed TRR income as revenue in financial statements before December 2013, it included the entire TRR income in gross operating revenue to calculate the amount of the electric general fund transfer for the first time after the December 2013 city council meeting. At that meeting, councilmembers reviewed a report from the Riverside finance department recommending the inclusion of all TRR funds in the gross operating revenue, then voted to accept this recommendation in calculating the electric general fund transfer. Riverside placed the item on the discussion calendar as part of its monthly and year-end financial results report; it did not hold a public hearing on the topic.

---

[3]    According to the verified petitions, in 2002, when Riverside transferred operations of the transmission lines to CAISO, Riverside petitioned the Federal Energy Regulatory Commission (FERC) to establish its Transmission Revenue Requirement (TRR). At the same time, it sought to include nine percent of the TRR in its electric general fund transfer. Pacific Gas and Electric objected, arguing the city's charter language authorizing the transfer applied to Riverside ratepayers only, not all market participants using the transmission lines. The parties entered a settlement approved by FERC, and subsequently some amount of the TRR was calculated and included in the electric general fund transfer. Transfers also occurred in 2009 and 2011.

A. *Verified Petition for Writ of Mandate*

On April 28, 2016, Webb filed a verified petition for writ of mandate in superior court alleging Riverside's inclusion of the full TRR income as part of its gross operating revenue constitutes an imposition of taxes in violation of California Constitution article XIII C, section 1, subdivisions (a) and (e)(2) and section 2, subdivisions (b) and (d) (Propositions 26 and 218).[4]  In response, Riverside filed a demurrer on the basis that the suit was time-barred by section 10004.5 and did not allege facts sufficient for application of Proposition 26 because there was no tax increase.  (Code Civ. Proc., § 430.10, subd. (e).)  The trial court granted the demurrer, finding the case was time-barred and giving Webb leave to amend.  In granting the demurrer, the trial court explained why it found the petition time-barred:  "[A]lthough Petitioner contends '[s]he is not challenging an increase to electric utility rates, as a rate increase has not occurred' [citation], multiple paragraphs within the Petition allege that the revised methodology resulted in either an 'increase' in the tax and/or 'overcharges' upon electric utility ratepayers.  [Citation.]  For purposes of ruling on the Demurrer if the court accepts these allegations as true, the action is time-barred, as the approval of the recommendation for the transfer of funds occurred on 12/17/13 and this action was filed on 4/28/16."

---

4     The petition also contained a complaint for declaratory and injunctive relief on the same basis and a second complaint for declaratory and injunctive relief seeking an imposition of a penalty against Riverside under Government Code section 53728.  Those claims were omitted in the verified second amended petition and are not relevant to this appeal.

The court also addressed the alleged tax increase: "Although Petitioner alleges that [s]he is actually challenging the transfer of funds and not challenging any changing of rate or charge, the challenge is being brought pursuant to Proposition 26 and 62 which . . . . would ultimately require a 'tax' through the changing of a rate or charge to the electric utility ratepayer."

B. *Verified First Amended Petition for Writ of Mandate*

Webb filed a verified first amended petition that removed the terms "rate," "rate increase," and "charge." Riverside demurred again, and the trial court granted the motion with leave to amend so Webb could explain the omissions. The court also noted a contradiction in the pleadings: "It appears Petitioner is trying to allege that the 'transfer' [of funds from the electric reserves to the general fund] was 'exaction' of a 'tax.' Although[] these allegations may be sufficient to allege that the *transfer* of the increased [electric general fund transfer] was a 'tax' under Prop[osition] 26's definition, which required voter approval, the First Amended Petition does not explain the omission of prior allegations, which allege an 'increase in the tax imposed upon electric utility ratepayers' and characterized the [electric general fund transfer] as inflating 'RPU electric rates . . . [and overcharging all RPU customers] . . . .' [citation]."

C. *Verified Second Amended Petition for Writ of Mandate*

Webb filed a verified second amended petition. This petition also omitted references to the word "rate" or "charge." Webb alleged section 10004.5 "requires payment by ratepayers through an increase in a Rate Schedule for an electric commodity or service, neither of which occurred here." To explain why section 10004.5 did not

5

apply, Webb further alleged "the amount imposed on ratepayers was not for an 'electric commodity or service,' but rather 'to support general City Services.'" She specified the transfer of TRR funds improperly exacted utility reserve funds for general purpose uses and did not provide a commensurate service or commodity. She alleged the electric general fund transfer "inflates RPU rates and overcharges customers." Webb wrote she removed "rate," "charge," and other "unnecessary extraneous language," because their inclusion caused confusion. Her allegations included a statement she originally had used the terms "rate" and "charge" "in their general sense, meaning money taken from ratepayers" and "not the meaning set forth in [section] 10004.5."

Riverside demurred to the verified second amended petition on the same bases as it had earlier. Riverside also argued the verified first and second amended pleadings were sham amendments because they contradicted allegations in the original petition. The court granted the demurrer without leave to amend. In its ruling, the court explained: "Petitioner has not abandoned the ordinary meaning of the terms 'rate' or 'charge,' which triggers [section] 10004.5, as the court previously determined. Petitioner's failure to sufficiently explain the reasons for removing the terms subjects the [second amended petition] to demurrer. Since Petitioner has had three chances to cure the defects, and has been unable to do so, the demurrer is sustained without leave to amend."

The court entered judgment for Riverside on April 12, 2017. Webb timely appealed.

6

DISCUSSION

I

*Legal Principles*

"On appeal from an order of dismissal after an order sustaining a demurrer, the standard of review is de novo:  we exercise our independent judgment about whether the complaint states a cause of action as a matter of law."  (*Stearn v. County of San Bernardino* (2009) 170 Cal.App.4th 434, 439.)  We evaluate whether a cause of action has been stated under any legal theory.  (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 637 (*Curcini*).)  As we do so, we assume the truth of the petition's properly pleaded facts and judicially noticed matters.  (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 (*Schifando*).)  "We do not, however, assume the truth of contentions, deductions, or conclusions of law."  (*Stearn*, at p. 440.)  We review the trial court's refusal to grant leave to amend the pleading under the abuse of discretion standard.  (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)  Because Webb does not propose any amendments, the question for us is whether the allegations of her petitions state legally sufficient claims under any theory.  (See *Curcini*, at p. 637.)  If the pleading is insufficient on any ground specified in a demurrer, we will uphold the order sustaining the demurrer, even if it is not the ground relied upon by the trial court.  (*Irwin v. Manhattan Beach* (1966) 65 Cal.2d 13, 20 (*Irwin*); *Debro v. Los Angeles Raiders* (2001) 92 Cal.App.4th 940, 946 (*Debro*).)

## II

### *Section 10004.5*

At issue is whether the verified petition alleged a fixing or changing of a "rate" or "charge," and if so whether the rate or charge is for an electric commodity or an electric service. Webb contends section 10004.5 reflects a limitation on challenges to formal ratemaking decisions through the adoption of a rate schedule, while Riverside contends it reflects a limitation on challenges to any decision to charge ratepayers any price designated for electric services or commodities.

Before considering the specific allegations, we look first to the legal framework creating the alleged defect: section 10004.5, subdivision (a). In construing the meaning of section 10004.5, we "determine and effectuate legislative intent" by looking to the statute's language. (*Woods v. Young* (1991) 53 Cal.3d 315, 323.) We give words their plain and commonsense meaning. (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103 (*Murphy*).) "[W]hen the statute's language is ambiguous or susceptible of more than one reasonable interpretation, [the court may] turn to extrinsic aids to assist in interpretation." (*Ibid.*) Moreover, "[w]ords must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible." (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 (*California Manufacturers Association*).) "Where a statute is theoretically capable of more than one construction we choose that which comports with the intent of the Legislature." (*Ibid.*)

8

Section 10004.5, subdivision (a) states, "any judicial action or proceeding against a municipal corporation that provides electric utility service, to attack, review, set aside, void, or annul an ordinance, resolution, or motion fixing or changing a rate or charge for an electric commodity or an electric service furnished by a municipal corporation and adopted on or after July 1, 2000, shall be commenced within 120 days of the effective date of that ordinance, resolution, or motion."

We begin our analysis by looking at the statute's language and giving the words their plain meaning.  (*Murphy, supra*, 40 Cal.4th at p. 1103.)  The Public Utilities Code does not offer a definition of "charge," but it defines "rates" as including "rates, fares, tolls, rentals, and charges, unless the context indicates otherwise."  (§ 210; § 5 [definitions in § 210 govern the Pub. Util. Code].)  Webster's Third New International Dictionary defines "rate" as "a charge, payment, or price fixed according to a ratio, scale, or standard."  (Webster's 3d New Internat. Dict. (2002) p. 1884.)  It defines "charge" as "the price demanded for a thing or service."  (*Id.* at p. 377.)  The plain, commonsense meanings of the terms "rate" and "charge" are broad, encompassing a price or cost sought.  Put in the context of section 10004.5, subdivision (a), a petitioner would need to make a judicial challenge within 120 days of the municipal utility fixing or changing the payment for which it asks or the price it demands for electric services or an electric commodity.

The statute also must be construed in context and harmonized with other statutes, so we look to other, related statutes and to the intent of the Legislature for further guidance.  (See *California Manufacturers Association, supra*, 24 Cal.3d at p. 844.)

9

Section 10004.5 was enacted as part of a larger revision to the Government and Public Utilities Codes in response to a series of lawsuits brought over water and sewage charges, which some public agencies had contended were improper because they were embedded or hidden within other charges and fees. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1674 (1999-2000 Reg. Sess.) as amended June 21, 2000, pp. 2-3 (Rules Committee Analysis).) In 1999, the Legislature introduced Assembly Bill No. 1657 (Assembly Bill 1657) to ensure "closure on challenges to the capital facilities fees or rate increases charged and paid" and to help "stabilize funding for facilities needed to accommodate new growth, reconstruct and refurbish aging facilities, improve delivery systems, and operate effectively, while keeping rates as low as possible." (Sen. Judiciary Com., Analysis of Assem. Bill No. 1657 (1999-2000 Reg. Sess.) as amended Aug. 16, 1999, pp. 2-3.)

From its inception, the bill was broader than formal ratemaking. The primary focus of Assembly Bill 1657 was to balance concerns of municipal utilities seeking stable funding against the desire of some public agencies for better notice and disclosure of fees charged by the utilities. (Gov. Code, § 54999, subd. (a); Sen. Judiciary Com., Analysis of Assem. Bill No. 1657 (1999-2000 Reg. Sess.) as amended Aug. 16, 1999, pp. 2-3.) Assembly Bill 1657 addressed these competing concerns by creating notice and disclosure requirements and by establishing a 120-day statute of limitations on challenges to rates, charges, and capital facilities fees to ensure certainty and stability for municipal public utility companies. (Sen. Conc. Amends. to Assem. Bill No. 1657 (1999-2000 Reg. Sess.) as amended Sept. 9, 1999, pp. 1-2.)

10

When the Governor vetoed Assembly Bill 1657 expressing concern the statute of limitations would apply to capital facilities fees even when those fees were not noticed or disclosed, the Legislature introduced Assembly Bill No. 1674 (Assembly Bill 1674).[5] (veto message; Rules Com. Analysis, p. 3.) Like its predecessor, Assembly Bill 1674 aimed to balance interests of municipal utilities with interests of certain public agencies by setting a 120-day statute of limitations for challenges to electric rates and charges, and by creating a notice procedure for certain public agencies regarding capital facilities fees.[6] (Assem. Com. on Utilities & Commerce, 3d reading analysis of Assem. Bill No. 1674 (1999-2000 Reg. Sess.) as amended Jan. 3, 2000, p. 1 (Com. on Utilities & Commerce Analysis).)

As Assembly Bill 1674 moved through the various Assembly and Senate committees, it was variously described as applying to "fee or rate increase[s]," "ratemaking decisions," and "rate[s] or charge[s] containing capital facilities fee." (Com. on Utilities & Commerce Analysis, pp. 1-2 [applies to "fee or rate increase" and to "lawsuits attempting to claim refunds or challenge the validity of the rates and charges"]; Sen. Local Government Com., Analysis of Assem. Bill No. 1674 (1999-2000 Reg. Sess.) as amended Mar. 9, 2000, pp. 1-2 [seeking clear deadline for challenges to "electric

---

5    The Governor's veto notice also expressed concern that the bill might have retroactive application. (Governor's veto message to Assem. on Assem. Bill No. 1657 (Oct. 12, 1999) 3 Assem. J. (1999-2000 Reg. Sess.) pp. 4553-4554 (veto message).)

6    There is a pending request for judicial notice of some of the legislative history of section 10004.5. We deny this request as unnecessary. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45-46, fn. 9.)

11

rates"; references capital facilities fees in context of "rate increase"]; Sen. Judiciary Com., Analysis of Assem. Bill No. 1674 (1999-2000 Reg. Sess.) as amended June 8, 2000 (Sen. Judiciary Com. Analysis), pp. 3-4 [references "capital facilities fees or rate increases charged and paid"; discusses the statute of limitations as applicable to a "challenge or protest [to] a rate or charge containing a capital facilities fee" as well as "ratemaking decisions" and later "a rate or charge made for an electric service"].) Additionally, though the Senate Judiciary Committee's legislative analysis identified Assembly Bill 1674 as a necessary extension of the 120-day statute of limitations on municipal water and sewage utility ratemaking decisions, it also drew a direct comparison to Government Code section 66022, which sets a statute of limitation for charges and fees outside formal ratemaking.[7]  (Sen. Judiciary Com. Analysis, p. 5.)

Government Code section 66022 applies a 120-day statute of limitations to "a new fee or service charge" identified in Government Code section 66013 or 66014. Government Code sections 66013 and 66014 include fees and charges that can be imposed outside formal ratemaking decisions, including fees for water connections and capacity charges (Gov. Code, § 66013) and fees related to zoning and building permits (*Id.* § 66014).  This comparison suggests the Legislature intended the statute of limitations to have broad reach.  Had the Legislature wanted to narrow the scope of the bill, it could have used the more specific term "ratemaking," or referenced rate schedules,

---

[7]     Assembly Bill 1674 also established Government Code section 54999.35, which sets out an exception to the 120-day statute of limitations for certain challenges to capital facilities fees for certain public agencies when notice and disclosure requirements are not met.  (Gov. Code, § 54999.35, subd. (b)(6) & (7).)

12

as it has in other sections of the Public Utilities Code. For example, the term "ratemaking" appears in the description of the Public Utilities Commission's organization (§ 321.1), discussing evidentiary requirements for judicial review of ratemaking decisions (§ 1757), and identifying entities with "ratemaking authority" in the context of net energy metering (§ 2827). The Public Utilities Code also references "rate schedules" and "schedules of rates" when it specifically addresses rate schedules. (See, e.g., §§ 378 [Pub. Util. Com. authorizes optional rate schedules and tariffs]; 729 [allowing Pub. Util. Com. to hold hearing to investigate "single rate" or the "entire schedule or schedules of rates"]; 729.5 [limiting movement of customers from one rate schedule to another]; and 30630.5 [requiring transit district to hold public hearing before adopting rate schedule or amendment thereto].)

Assembly Bill 1674 also extended a water and sewage industry statute of limitations, section 14402, which set a 120-day limit for challenges to "rates" or "charges" for a commodity or service. There is no published case law applying or analyzing section 14402,[8] section 10004.5, or any of the other statutes with identical language,[9] but the statutory goal is consistent with a plain, commonsense meaning of the

---

[8] The court in *Util. Cost Management v. E. Bay Mun. Util. Dist.* (2000) 79 Cal.App.4th 1242 declined to consider whether section 14402 barred a complaint in that case, having already concluded the case was barred by the statute of limitations established by Government Code section 66022. (*Id.* at p. 1253, fn. 4.)

[9] Assembly Bill 1674 also established Public Utilities Code sections 12702.5 and 16402.5 and Water Code section 22651.5, each of which is identical to Public Utilities Code section 10004.5.

13

words "rate" and "charge." Assembly Bill 1674 intended to protect public utilities from the fiscal uncertainty that results when a plaintiff can challenge any decision years after it is made. (See Gov. Code, § 54999, subd. (a); Rules Com. Analysis, p. 3 [Assembly Bill 1674 intended to help provide comfort to electric utility services by ensuring there would be closure on challenges to rate increases charged and paid].) Assembly Bill 1674 combatted this uncertainty by establishing a reasonable period of time beyond which a municipal utility would not face exposure to refund claims or challenges to the validity of rates or charges. (Com. on Utilities & Commerce Analysis, p. 2, cmt. 3.)

This policy is best served by a broad reading of the statute; otherwise, a party could request a refund years after a charge had been collected, making it difficult for the utility to maintain a stable budget. Any concern that this reading of the statute would create unfair results "goes fundamentally to the *wisdom* of the statute of limitations, not its *applicability*."[10] (*Indian Wells, supra*, 26 Cal.4th at p. 1197 [discussing the applicability of the statute of limitations in the context of water charges].)

Thus, we interpret the 120-day statute of limitations outlined in section 10004.5 to apply to an ordinance, resolution, or motion fixing or changing any rate or charge collected by the municipal electric utility for an electric service or commodity.

Having concluded section 10004.5 refers to an ordinance, resolution, or motion that fixes or changes any rate or charge designated to pay an electric utility, we now turn

---

[10] Webb does not argue, and so we do not address, whether equitable tolling would be appropriate on the basis of the alleged charge being hidden and so undiscoverable within the statute of limitations. (See *Utility Cost Management v. Indian Wells Valley Water District* (2001) 26 Cal.4th 1185, 1198 (*Indian Wells*).)

to the language in the pleadings to assess whether Webb's allegations are time-barred under the statute.

III

*Application of Section 10004.5 to the Verified Pleadings*

Courts generally disregard original pleadings in favor of amended pleadings. (*Kenworthy v. Brown* (1967) 248 Cal.App.2d 298, 302 (*Kenworthy*).)  However, if an amended pleading attempts to avoid an earlier defect, courts evaluate the prior pleading to determine if the amendment is a sham.  (*Ibid.*)  Relevant facts which make a pleading defective cannot simply be omitted.  (See *Hills Transp. Co. v. Southwest Forest Industries, Inc.* (1968) 266 Cal.App.2d 702, 713.)  This is particularly so when the original pleading is verified.  (*Wennerholm v. Stanford University School of Medicine* (1942) 20 Cal.2d 713, 716 [verified allegations cannot be cured by their omission without sufficient explanation].)  The general rule is "material factual allegations in a verified pleading that are omitted in a subsequent amended pleading without adequate explanation will be considered by the court in ruling on a demurrer to the later pleading." (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 12 (*Shoemaker*); *Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 384 (*Owens*) [policy against sham pleading permits court to "disregard the inconsistent allegations and read into the amended complaint the allegations of the superseded complaint"].)  A pleading fails to state a cause of action if the allegations demonstrate the action is barred by the applicable statute of limitations. (*Debro, supra*, 92 Cal.App.4th at p. 946.)  Thus, we will compare the verified allegations

15

in the original and second amended petitions to assess whether, in our view, the omitted facts simply attempt to plead around the statute of limitations.

The original verified petition alleged the increase in the electric general fund transfer resulted in an "overcharge" to all utility customers. Webb alleged the result of the transfer is "higher charges and fees," and the fees "exceed the reasonable costs to [Riverside] of providing electric utility services." Webb also alleged the transfer was a way to collect revenue from utility rates, Riverside overcharged customers, the rates were inflated, and relief was warranted because Riverside would continue to "overcharge and collect excessive and arbitrary fees."

In her verified second amended petition, Webb removed all references to the words "rate" or "charge," other than to allege "Riverside did not change, fix or extend a utility rate or charge for an electric commodity or service under . . . section 10004.5." She also alleged "rates" and "charges" had remained steady since March 2013. In place of the original allegations of inflated rates and overcharges, Webb alleged Riverside had "unlawfully exacted and used revenues generated from ratepayers in the form of reserves . . . ."

Our determination *ante* that section 10004.5, subdivision (a) incorporates the plain meanings of "rate" and "charge," highlights the contradiction in the verified petitions. We are not bound to accept as true later allegations contrary to factual allegations in a former petition in the same case, and we do not ignore the earlier inconsistent allegations in the original verified petition here. (*Shoemaker, supra*, 52 Cal.3d at p. 12; *Potter v.*

16

*Arizona So. Coach Lines* (1988) 202 Cal.App.3d 126, 133, fn. 2; *Owens, supra*, 198 Cal.App.3d at p. 384.)

Webb verified in her original petition Riverside overcharged customers, took action that resulted in higher charges and fees, and imposed rates in excess of the actual cost of services, but also verified in her second amended petition the city council's action did not change, fix, or extend a utility rate or charge at all. Webb cannot undo the contradicted verified allegations in her original petition, especially when doing so is to avoid the applicable statute of limitations, which was her rationale here. (*Kenworthy, supra*, 248 Cal.App.2d at p. 302.) Additionally, her allegations that the electric general fund transfers result in ratepayer payment of fees that exceed the reasonable cost of services, suggesting they are not for an electric service or commodity, do not save her petition from the statute of limitations. The electric service or commodity is what Riverside sold to ratepayers and what ratepayers bought, placing the charges within section 10004.5.

Webb filed her complaint April 28, 2016, more than two years after the December 2013 city council decision, long after the 120-day limit had passed, so her claim is time-barred. (See § 10004.5, subd. (a).) This conclusion is consistent with the policy underpinning section 10004.5. Permitting this case to move forward and seek refunds of electric service charges more than two years after Riverside's decision would place the municipal utility in a state of fiscal uncertainty, which is what the statute of limitations was intended to prevent.

## IV

### *The Electric General Fund Transfer is Not a Tax Increase*

Though Webb's claim is barred by the applicable statute of limitations, we separately address the theory raised by Webb's verified second amended petition to dispel any doubt as to whether a cause of action could be stated under another possible legal theory. (*Curcini, supra*, 164 Cal.App.4th at p. 637.) Webb's sole cause of action in the verified second amended petition is a writ of mandate for violation of Propositions 26 and 218. Webb contends Riverside's transfer of funds from the electric utility reserve fund is an exaction of ratepayer money conducted without the required public vote and completed in violation of Riverside's City Charter.

The question of whether a charge is a tax is a question of law that we decide on independent review of the facts. (See *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 873-874.) Because this matter was dismissed on demurrer, we assume the truth of the petition's properly pleaded facts and judicially noticed matters. (*Schifando, supra*, 31 Cal.4th at p. 1081.) We also sustain the demurrer if the pleading is insufficient on any ground. (*Irwin, supra*, 65 Cal.2d at p. 20.)

Proposition 218 amended the Constitution to limit local government taxation. (Cal. Const., art. XIII C.) It prohibits local governments from imposing, extending, or increasing a general tax unless the tax is approved by a majority vote of the electorate. (*Id.*, § 2, subd. (b).) A general tax is one "imposed for general governmental purposes." (*Id.*, § 1, subd. (a).) Courts have interpreted this to include taxes whose revenues are

18

placed in the general fund, making them available for any governmental purpose. (*Gonzalez v. City of Norwalk* (2017) 17 Cal.App.5th 1295, 1306 (*Gonzalez*).)

Propositions 26 and 218 amended the Constitution to add a definition of taxes and identify which taxes require voter approval. (Cal. Const., art. XIII C, § 2, subds. (a)-(d).) A tax includes "[a]ny levy, charge or exaction of any kind imposed by a local government." (*Id.*, § 1, subd. (e).) Proposition 26 identified seven exceptions to the definition of "tax," none of which was raised in this case. (See *ibid.*) A levy, charge, or exaction is exempt from the voter approval requirements if the charge for the service or product does not exceed the reasonable cost to the local government providing it. (*Ibid.*)

A tax is imposed when first enacted. (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 944.) A tax is extended when an agency lengthens the time period during which it applies. (Gov. Code, § 53750, subd. (e).) A tax is increased when an agency revises its methodology for calculating a tax and the revision results in increased taxes being levied on any person or parcel. (*Id.*, subd. (h)(1).)

Webb alleged an imposition of taxes through exaction of utility reserve funds through a transfer to the general fund. She alleged this increased taxes through a change in methodology in calculating the amount of money transferred to the general fund. She alleged Riverside transferred funds from the electric utility's gross operating revenues to the general fund under the terms of Riverside's City Charter before 2013 and also unlawfully transferred portions of the TRR funds after December 2013. She further alleged Riverside changed its methodology for calculating the fund transfer because

19

Riverside now includes the full amount of TRR funds in the utility's gross operating revenue.

The electric general fund transfer is not an imposed, or new, tax because Riverside has been transferring up to 11.5 percent of its electric utility's gross operating revenues to the general fund since 1977 and has also transferred at least some money from the TRR. It also is not an extension of a tax because there was no time limit to the electric general fund transfers. At issue is whether the transfers qualify as a tax increase through a revised methodology for calculating it.

No vote is required under Proposition 218 if the taxing methodology is "frozen in time until the electorate approves higher taxes." (*AB Cellular LA, LLC v. City of Los Angeles* (2007) 150 Cal.App.4th 747, 761-762 (*AB Cellular*).) A "methodology" is a "mathematical equation for calculating taxes that is officially sanctioned by a local taxing entity." (*Id*. at p. 763, citing Gov. Code § 53750.) There is a tax increase via revised methodology when "the math behind it is altered so that either a larger tax rate or a larger tax base is part of the calculation." (*AB Cellular*, at p. 763.) A utility can enforce less of a tax than is permitted by a grandfathered methodology, then later enforce the full amount due without an election. (*Ibid.*; see *Brooktrails Township Community Services Dist. v. Board of Supervisors of Mendocino County* (2013) 218 Cal.App.4th 195, 207 [Prop. 26 does not apply retroactively].) Additionally, there is no increase if the agency's methodology is "not revised so as to result in an increase in the amount being levied on any person or parcel." (Gov. Code § 53750, subd. (h)(2)(B); *Gonzalez, supra*, 17 Cal.App.5th at p. 1313 ["[A] revision to the methodology by which a tax is calculated

20

constitutes a tax 'increase' only if it increases the amount levied on taxpayers."].)  Thus, we ask "not simply whether a taxing agency has revised the methodology by which a tax is calculated, but also whether that revised methodology has resulted in a greater tax burden for tax payers."  (*Gonzalez*, at pp. 1313-1314.)

Webb alleged the inclusion of the full TRR is a change in the mathematical equation in the way Riverside calculates the electric general fund transfer because it incorporates additional reserve money into the "gross operating revenues" portion of the formula.  The parties dispute whether the inclusion of the full TRR revenue in "gross operating revenues" for calculating the electric general fund transfer is a change in the mathematical equation or enforcement of a grandfathered methodology frozen in time. We do not need to resolve this conflict; we treat the factual allegations in the verified petitions as true for purposes of evaluating the demurrer.  (*Schifando, supra*, 31 Cal.4th at p. 1081.)

Even if the inclusion of the full TRR in the gross operating revenue calculation is a change in mathematical calculation or formula, if it does not increase the amount levied on Riverside ratepayers, it is not a tax increase.  (See Gov. Code § 53750, subd. (h)(2)(B); *Gonzalez, supra*, 17 Cal.App.5th at p. 1314.)  For example, in *Gonzalez*, the city had exempted from its taxation telephone calls that were exempted from federal taxes under federal law.  (*Gonzalez*, at p. 1310.)  When federal case law interpreted the federal statute to include more calls in the federal exemption, the city modified its ordinance to remove reference to the federal statute.  (*Id.* at pp. 1310, 1312.)  This allowed the city to continue charging a tax on the calls it already had been taxing.  (*Id.* at p. 1314.)

21

Taxpayers sued and argued the elimination of the reference to the federal law in the city's ordinance expanded the kinds of phone service subject to the tax. (*Id.* at pp. 1306-1307.) The court held the city's action was not a tax increase because it did not result in higher payments by taxpayers. (*Id.* at p. 1312.) Thus, "a revision to the methodology by which a tax is calculated constitutes a tax 'increase' only if it increases the amount on taxpayers" because it "has resulted in a greater tax burden for taxpayers." (*Id.* at pp. 1313-1314, discussing *AB Cellular, supra*, 150 Cal.App.4th 747.)

Like the taxpayers in *Gonzalez*, Riverside ratepayers have experienced no increases in billing charges since the inclusion of the full TRR funds in the calculation of the electric utility's gross operating revenue. Webb's verified second amended petition alleges ratepayers pay no more now than they did before the December 2013 council meeting. Webb has alleged Riverside collects the additional funds it transfers from the wholesale revenues of the TRR, not Riverside ratepayers. Though the facts here are distinguishable from *Gonzalez* because Riverside's actions do not change the language of the city's ordinances or charter, the result is the same: no increased charges to ratepayers. (See *Gonazlez, supra*, 17 Cal.App.5th at pp. 1313-1314.)

This leaves Webb in a quandary. She cannot amend the verified second amended petition to allege a rate increase to the Riverside ratepayers because doing so would run afoul of the 120-day statute of limitations, as discussed *ante*. Yet, absent an increase in the amount paid by ratepayers, Webb cannot sustain a cause of action for violation of Proposition 26. (See Gov. Code § 53750, subd. (h)(2)(B); *Gonzalez, supra*, 17 Cal.App.5th at pp. 1313-1314.) Either way, Webb cannot meet the pleading

22

requirements for a writ of mandate based on Riverside City Council's December 2013 decision.

DISPOSITION

The judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


NARES, J.


GUERRERO, J.

Filed 5/11/18

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ALYSIA WEBB, | D073449 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. RIC1605106) |
| CITY OF RIVERSIDE, | |
| Defendant and Respondent. | ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed May 4, 2018, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties

25