Filed 9/11/24

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----


| | |
|---|---|
| CITY OF GRIDLEY et al., | C100191 |
| Petitioners, | (Super. Ct. No. 21CV00451) |
| v. | |
| THE SUPERIOR COURT OF BUTTE COUNTY, | |
| Respondent; | |
| SCOTT MCMILLAN et al., | |
| Real Parties in Interest. | |


ORIGINAL PROCEEDING in mandate. Stay issued. Petition granted with directions. Tamara L. Mosbarger, Judge.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Meghan A. Wharton and Matthew C. Slentz for Petitioners.

No appearance for Respondent.

McNeill Law Offices and Walter P. McNeill for Real Parties in Interest.


1

The City of Gridley operates an electric utility that provides electricity to local residents. In this case, real parties in interest (plaintiffs) challenge the city council's approval of reduced electric rates for residential users in September 2020. Plaintiffs believe these rates—which were in effect for about three years—exacted a tax from residential users because they resulted in charges for electric service that exceeded the reasonable cost of providing electric service. Plaintiffs challenge these rates for two reasons. First, they allege that these rates violated article XIII C of the California Constitution (article XIII C), which prohibits local governments from imposing, extending, or increasing any tax without voter approval. Second, relying on the unconstitutional conditions doctrine, they allege that these rates violated the state and federal takings clauses.

After unsuccessfully moving for summary judgment against plaintiffs in the trial court, the City of Gridley and its city council (together, the City) filed a petition for writ of mandate in this court, seeking a writ directing the trial court to set aside its order denying the motion and to enter a new order granting the motion. We afterward directed plaintiffs to show cause why the writ should not be issued. Having now considered the parties' competing arguments, we conclude that the City is entitled to the relief it seeks. We find article XIII C inapplicable, because in reducing its electric rates, the City did not impose, extend, or increase any tax. We further find the unconstitutional conditions doctrine inapplicable, because in takings cases, courts have applied this doctrine only in the land-use permitting context. We will direct the trial court to set aside its order denying the City's motion for summary judgment and to enter a new order granting the motion.

BACKGROUND

The City operates an electric utility called the Gridley Electric Utility. The utility receives the bulk of its revenues from selling power to residential, commercial, and industrial customers. These revenues (along with the utility's other revenues) are placed

2

in the City's electric enterprise fund—a fund that tracks monies received and expended for electric service. (See *Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 5-6 (*Citizens for Fair REU Rates*) ["An enterprise fund is a budgetary device 'used to track monies received and expended for municipal services where fees or charges to the users of those services pay wholly or in part for such services' "].) In recent years, the City has annually transferred between $1,200,000 and $1,600,000 from its electric enterprise fund to its general fund.

The city council sets the utility's electric rates. Before November 2020, the City's electric rates for residential customers had five tiers, with users charged different prices for different amounts of use. Users were charged 16.2 cents per kilowatt for the first 475 kilowatt-hours used per month (tier 1), 22.4 cents per kilowatt for the next 100 kilowatt-hours used per month (tier 2), and more still in the highest three tiers. In September 2020, City staff recommended that the city council decrease these rates. Staff proposed decreasing electric rates by three percent for the three lowest tiers and eliminating the two highest tiers. The city council approved the proposal in September 2020, with the reduced rates taking effect in November 2020.

On the last day to challenge the approval of these reduced rates, plaintiffs—four residential ratepayers—filed a petition for writ of mandate and class action complaint. (Pub. Util. Code, § 10004.5, subd. (a).) Plaintiffs alleged that the City has a long-standing practice of setting electric rates at levels higher than necessary, collecting excessive revenues from ratepayers as a result, and transferring these excess revenues to its general fund. They further alleged that the City's September 2020 rate reduction did not meaningfully address this issue, because rates were still set high enough to support a transfer of $1,200,000 to the general fund.

Plaintiffs alleged four causes of action. First, they alleged that the City's rates violated the tax limitations in article XIII C, because they resulted in charges exceeding the reasonable cost of service—and thus resulted in a tax—that the voters never

3

approved. Second, they alleged that the City's rates violated the state and federal takings clauses under the unconstitutional conditions doctrine. They reasoned that these rates subjected them to a constitutionally impossible choice—either pay excessive charges for electric service or forego electric service altogether. Lastly, plaintiffs alleged causes of action for unjust enrichment and declaratory relief. For relief, plaintiffs sought among other things an order directing the City to set aside the rates it approved in September 2020 and to refund residential ratepayers for the alleged overcharged amounts.

The City moved for summary judgment or, in the alternative, summary adjudication. Starting with the article XIII C cause of action, it argued that plaintiffs' claim failed for two reasons. First, it contended that its transfers to its general fund are not, as plaintiffs allege, financed by rate revenues—that is, revenues from the rates billed to and collected from electric users. They are instead, it argued, financed by non-rate revenues, and it cited in support two sources of alleged non-rate revenues. One source concerned the revenues it receives for maintaining another city's electrical system. These revenues are currently over $450,000 per year. Another source involved the credits it receives because of its ownership interest in several power plants. In recent years, these credits have annually offset over $1,300,000 of the costs the City incurs to maintain its interest in these facilities and to purchase power from these facilities. Because the combined value of these revenues and credits always exceeds the amounts transferred to the general fund, the City asserted that these transfers are not paid out of rate revenues. Second, the City argued that article XIII C is inapplicable because it only applies when a local government imposes, extends, or increases a tax; and here, the City did not impose, extend, or increase anything when it approved reduced rates in September 2020.

Turning to the remaining causes of action, the City argued that plaintiffs' takings claim failed for several reasons. It argued that utility fees are never takings under the state and federal takings clauses. It further argued that while the unconstitutional conditions doctrine applies in some takings claims, it applies only in cases involving

4

challenges to land-use permitting conditions and is inapplicable in cases involving generally applicable fees. And it argued that plaintiffs' takings claim is premised on two alleged property interests—the money they paid for electric service and their interest in continued electric service—neither of which is a property interest protected under the state and federal takings clauses. Lastly, the City argued that plaintiffs' causes of action for unjust enrichment and declaratory relief also failed, in part because these causes of action were tied to plaintiffs' article XIII C and takings claims.

The trial court denied the City's motion. For the article XIII C cause of action, it found neither of the City's arguments persuasive. It rejected the City's argument that rate revenues do not finance the transfers to the general fund, stating that these transfers are evidence that there may be excessive charges and that triable issues of fact remained on this issue. It also rejected the City's argument that article XIII C is inapplicable because it applies only when a local government imposes, extends, or increases a tax. It concluded that plaintiffs could challenge the City's approved rate changes in September 2020 under article XIII C, even if the City's action only decreased rates. For the takings cause of action, the court addressed only the City's argument that plaintiffs lack a property interest protected under the state and federal takings clauses. It found that triable issues of fact precluded it from finding that plaintiffs lack a property interest in continued electric service. Without discussing the City's remaining arguments, the court denied the City's motion.

The City filed a petition for writ of mandate in this court, seeking a writ directing the trial court to set aside its decision and to enter a new order granting its motion. We afterward directed plaintiffs to show cause why the writ should not be issued and stayed further proceedings in the trial court.[1]

---

[1] In briefing before our court, all parties agree that the City no longer uses the rates it approved in September 2020, having approved increased electric rates in October 2023.

5

DISCUSSION

I

*Article XIII C Claim*

The City contends the trial court was required to grant its motion for summary judgment because each of plaintiffs' causes of action fails as a matter of law. (See Code Civ. Proc., § 437c, subd. (c) [a "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"].) We consider first the City's challenge to plaintiffs' cause of action based on article XIII C.

A.      *Legal Background*

Article XIII C is the product of two propositions. First, in 1996, voters added article XIII C with the passage of Proposition 218. (*Citizens for Fair REU Rates, supra*, 6 Cal.5th at p. 10.) Under that proposition, as relevant here, "[l]ocal governments may not impose, increase, or extend: (1) any general tax, unless approved by a majority vote at a general election; or (2) any special tax, unless approved by a two-thirds vote." (*Id.* at pp. 10-11.) Proposition 218 defined "[g]eneral tax" to mean a "tax imposed for general governmental purposes," and it defined "[s]pecial tax" to mean a "tax imposed for specific purposes . . . which is placed into a general fund." (Voter Information Guide, Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 3.) Those restrictions and definitions remain in article XIII C today. (Art. XIII C, §§ 1, 2.)

Later, in 2010, voters amended article XIII C with the passage of Proposition 26. (*Citizens for Fair REU Rates, supra*, 6 Cal.5th at p. 11.) In its findings, Proposition 26 said "California taxes have continued to escalate" despite the enactment of Proposition 218. It also highlighted one perceived cause: State and local governments "have disguised new taxes as 'fees' " to increase revenues without having to follow constitutional voting requirements for taxes. (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, subds. (c) & (e), p. 114.)

6

To prevent this practice, Proposition 26 made two changes to article XIII C. First, it broadly defined " 'tax' " to include "any levy, charge, or exaction of any kind imposed by a local government"—with several enumerated exceptions to this definition. (Art. XIII C, § 1, subd. (e); *Citizens for Fair REU Rates, supra*, 6 Cal.5th at p. 11.) Among the exceptions is one for charges "imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." (Art. XIII C, § 1, subd. (e)(2).) Second, it placed on local governments "the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." (*Id.*, subd. (e)(7).)

B.      *Analysis*

The City contends article XIII C is inapplicable for the same two reasons it raised in the trial court. First, it acknowledges plaintiffs' objection that it sets its electric rates at excessive levels and then transfers the resulting excess revenues to its general fund. But it argues that this objection is misplaced because these transfers are not paid out of rate revenues; they are instead paid out of non-rate revenues. Second, the City asserts that article XIII C is also inapplicable for another reason: The City did not "impose, extend, or increase" any tax under article XIII C when it approved reduced electric rates in September 2020. We agree with the City's second argument.

Under article XIII C, again, local governments cannot "impose, extend, or increase" any general tax unless approved by a majority vote (art. XIII C, § 2, subd. (b)), nor can they "impose, extend, or increase" any special tax unless approved by a two-thirds vote (*id.*, subd. (d)). Here, plaintiffs' challenge concerns the City's September 2020 amendment to its electric rates—which plaintiffs characterize as either a special tax

7

or a general tax. In that amendment, as discussed, the City reduced its electric rates by three percent for its three lowest tiered rates and eliminated its two highest tiered rates. But nothing in this amendment imposed, extended, or increased anything within the meaning of article XIII C.

Covering these terms in order, the City did not *impose* any "tax"—that is, any levy, charge, or exaction (art. XIII C, § 1, subd. (e))—in its September 2020 amendment. "[I]n the context of the Constitution's taxation provisions, . . . the 'ordinary meaning' of ' "impose" ' is merely to ' "establish." ' " (*Zolly v. City of Oakland* (2022) 13 Cal.5th 780, 791.) Or as another court put it, "[a] tax is imposed when first enacted." (*Webb v. City of Riverside* (2018) 23 Cal.App.5th 244, 258 (*Webb*); see also Ballot Pamp., Gen. Elec. (Nov. 2, 2010), analysis of Prop. 26 by the Legis. Analyst [using "create" and "impose" interchangeably].) But here, the City did not impose (i.e., first enact) its electric rates in September 2020. It imposed its rates before that time. And in September 2020, the City only amended its existing charging structure to reduce its electric rates.[2]

The City also did not *extend* any tax in its September 2020 amendment. "For purposes of Article XIII C . . . of the California Constitution," a government body extends a tax, fee, or charge when it decides "to extend the stated effective period for the tax or fee or charge, including, but not limited to, amendment or removal of a sunset provision or expiration date." (Gov. Code, § 53750, subd. (e); see also *Greene v. Marin*

---

[2] In some sense, perhaps, you could say that a local government *imposes* a reduced tax when it reduces an existing tax. But endorsing this broad reading of "impose" would render the words "increase" and "extend" in article XIII C superfluous, for it would mean that a local government *imposes* an increased tax when it increases an existing tax and *imposes* an extended tax when it extends an existing tax. The canon against surplusage disfavors this expansive interpretation of "impose." (See *Klein v. United States of America* (2010) 50 Cal.4th 68, 80 ["courts must strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous"].) So too does case law construing the California Constitution's tax provisions. (See *Webb, supra*, 23 Cal.App.5th at p. 258 ["A tax is imposed when first enacted"].)

8

*County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 286 [the Legislature added Gov. Code, § 53750 et seq. "to clarify the implementation of Proposition 218"]; *Webb, supra*, 23 Cal.App.5th at p. 258.) But here, the City did not extend the stated effective period for anything. It simply reduced its existing electric rates.

Lastly, the City did not *increase* any tax in its September 2020 amendment, because that amendment, again, only reduced the City's electric rates. (Gov. Code, § 53750, subd. (h)(1) [" 'Increased,' when applied to a tax, assessment, or property-related fee or charge, means a decision by an agency that . . . either" (1) "[i]ncreases any applicable rate used to calculate the tax, assessment, fee, or charge" or (2) "[r]evises the methodology by which the tax, assessment, fee, or charge is calculated, if that revision results in an increased amount being levied on any person or parcel"].) The City's rate reduction, then, did not "impose, extend, or increase" anything within the meaning of article XIII C. (Art. XIII C, § 2, subds. (b) & (d).)

Requiring voter approval here would thus be inconsistent with article XIII C's plain text. It would also be inconsistent with Proposition 26's purpose. Proposition 26, in its findings, said "California taxes have continued to escalate," noted "Californians are taxed at one of the highest levels of any state in the nation," and said the measure would restrict local governments' ability to increase taxes without voter approval. (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, subds. (c), (e), & (f), p. 114.) Proposition 26 thus evinced a clear concern about high tax burdens and served to place limits on local governments' ability to increase taxes. (*Humphreville v. City of Los Angeles* (2020) 58 Cal.App.5th 115, 124 [Prop. 26 was intended "to stop 'local governments' from 'extract[ing] even more revenue from California taxpayers' " (italics omitted)].) But under plaintiffs' position, Proposition 26 would also limit local governments' ability to *reduce* certain taxes. That approach, however, would defy both Proposition 26's text and purpose.

9

Plaintiffs, for their part, make no argument to the contrary. They never even respond to the City's contention that its September 2020 amendment did not impose, extend, or increase any tax. And although the trial court believed our Supreme Court's decision in *Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685 (*Barratt American*) favored a contrary conclusion on this topic, we find that case distinguishable.

*Barratt American*, as relevant here, concerned the Mitigation Fee Act (Gov. Code, §§ 66000-66025), not article XIII C. Among other things, the Mitigation Fee Act bars local agencies from imposing service fees that exceed the estimated reasonable costs of service (*Barratt American, supra*, 37 Cal.4th at p. 703), and it authorizes judicial action to attack a local agency's resolution " 'modifying or amending an existing fee' " (*id.* at p. 702). The court in *Barratt American* considered whether a city's reenactment of certain fees—without any change in the amounts of these fees—constituted a modification or amendment of an existing fee within the meaning of this act. (*Id.* at p. 703.) The court found it did. It reasoned that in reenacting these fees, the city had extended the duration of these fees—and so had modified or amended them—even though the fee amounts remained the same. (*Ibid.*)

Although relying on *Barratt American*, the trial court never reached a similar conclusion here. It never found, that is, that the City had extended the duration of its electric rates or anything else. It instead focused on a portion of *Barratt American* saying that the city there, in reenacting its fees, implicitly represented that these fees did not exceed the estimated reasonable cost of the services for which the fees were charged. (*Barratt American, supra*, 37 Cal.4th at pp. 703-704.) The trial court found a similar conclusion fitting here. It found that the City, in approving its reduced electric rates, implicitly represented that these rates met the legal requirements for adoption under article XIII C without voter approval. Or to be more specific, the court found that the City implicitly represented that the revenues resulting from these rates would not exceed

10

the reasonable costs of providing electric service.  Based on that, and citing *Barratt American*, the court concluded that the September 2020 rate amendment could be challenged under article XIII C.

We find the trial court's reliance on *Barratt American* and its discussion of the Mitigation Fee Act misplaced.  *Barratt American* involved different facts, including a city action that extended the duration of several fees.  (*Barratt American, supra*, 37 Cal.4th at p. 703.)  It also involved different law.  While article XIII C and the Mitigation Fee Act share some similarities, they include different requirements and use different language.  Had article XIII C used the same language in the Mitigation Fee Act, we would probably agree with the trial court.  That is because the Mitigation Fee Act, among other things, authorizes judicial action to attack a city resolution " 'modifying or amending an existing fee' " (*Barratt American,* at p. 702); and in this case, no one disputes that the City modified or amended its existing electric rate.  But article XIII C's language is different than that in the Mitigation Fee Act.  Among other differences, article XIII C does not broadly cover any modification or amendment.  It instead covers government action imposing, extending, or increasing any tax.  And for the reasons covered, an approved decrease of an existing electric rate is none of these things.

II

*Takings Claim*

We consider next the City's challenge to plaintiffs' takings claim.

A.    *Legal Background*

The Fifth Amendment, which is made applicable to the states through the Fourteenth Amendment, states:  "[N]or shall private property be taken for public use, without just compensation."  (U.S. Const., 5th Amend.)  The California Constitution includes similar language, though it discusses both the taking of property and damages to property.  (Cal. Const., art. I, § 19, subd. (a).)  Because of the state clause's mention of damages, our Supreme Court has said that it " 'protects a somewhat broader range of

11

property values' than does the corresponding federal provision." (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664.)  But it has noted that "aside from that difference, not pertinent here, we appear to have construed the clauses congruently." (*Ibid.*)

Courts have identified several circumstances that violate the state and federal takings clauses.  We note three general circumstances here, focusing on federal case law.  Courts have found the right to compensation under the federal takings clause triggered when the government " 'physically appropriat[es]' property or otherwise interfere[s] with the owner's right to exclude others from it." (*Sheetz v. County of El Dorado* (2024) 601 U.S. 267, 274 (*Sheetz*).)  Courts have found likewise when the government imposes use restrictions that "sap[] too much of the property's value or frustrate[] the owner's investment-backed expectations." (*Ibid.*)  And relying on the unconstitutional conditions doctrine, courts have found the government violates the federal takings clause when it makes "[e]xtortionate demands for property in the land-use permitting context." (*Koontz v. St. Johns River Water Management Dist.* (2013) 570 U.S. 595, 607 (*Koontz*).)

The last of these circumstances is most relevant here.  The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." (*Koontz, supra*, 570 U.S. at p. 604.)  A " 'special application' of this doctrine . . . protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits." (*Ibid.*)  In these cases, the Supreme Court has noted that government officials may reasonably require landowners to "internalize the negative externalities of their conduct." (*Id.* at p. 605.)  So, for example, "[w]here a building proposal would substantially increase traffic congestion, . . . officials might condition permit approval on the owner's agreement to deed over the land needed to widen a public road." (*Ibid.*)  But the court has found that government permitting conditions may sometimes go too far and make extortionate demands on land-use permit applicants—a group the court has found

"especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits . . . ." (*Id.* at pp. 604-605.)

To ensure against extortionate demands against these permit applicants, the Supreme Court has established a two-part test for evaluating land-use permitting conditions—which is often called the *Nollan*/*Dolan* test after the two cases that established it. (*Sheetz, supra*, 601 U.S. at pp. 275-276.) "First, permit conditions must have an 'essential nexus' to the government's land-use interest." (*Id.* at p. 275.) And "[s]econd, permit conditions must have ' "rough proportionality" ' to the development's impact on the land-use interest." (*Id.* at pp. 275-276.) These requirements "ensure[] that the government is acting to further its stated purpose, not leveraging its permitting monopoly to exact private property without paying for it," and prevent the government from "requir[ing] a landowner to give up more than is necessary to mitigate harms resulting from new development." (*Ibid.*)

The Supreme Court has never applied this test beyond the land-use permitting context. (*City of Monterey v. Del Monte Dunes at Monterey, Ltd.* (1999) 526 U.S. 687, 702 (*City of Monterey*) [noting the court has not required rough proportionality "beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public use"]; see also *Sheetz, supra*, 601 U.S. at p. 275 ["*Nollan* and *Dolan* address . . . potential abuse of the [land-use] permitting process"].) And in one of its more recent cases on this topic, *Koontz*, the court emphasized that its reasoning "does not affect the ability of governments to impose property taxes, user fees, and similar laws and regulations that may impose financial burdens on property owners." (*Koontz, supra*, 570 U.S. at p. 615.) It also categorically stated that "[i]t is beyond dispute that '[t]axes and user fees . . . are not "takings." ' " (*Ibid.*)

13

B.    *Analysis*

The City contends plaintiffs' takings claim fails as a matter of law for two reasons. First, it argues that plaintiffs have not raised a viable takings claim, because they have not shown that they have been deprived of any property interests protected under the state and federal takings clauses. They reason that plaintiffs base their claim on two alleged property interests—the fees they paid for electric service and their interest in continued electric service—neither of which is protected under the state and federal takings clauses. Second, the City argues that plaintiffs rely on a legal theory—the unconstitutional conditions doctrine—that is inapplicable in this case. We agree with the City's second argument.

As plaintiffs confirm in their briefing before our court, the theory for their takings claim "follows the 'unconstitutional conditions' doctrine." Invoking that doctrine and *Koontz*, plaintiffs contend "the 'taking' occurs when the City requires the captive Gridley electric customer to pay an illegally excessive electric rate on condition/threat of termination of electric services if the full rate (including the illegally excessive portion) is not paid." But as covered above, *Koontz* " 'involve[d] a special application' of th[e] [unconstitutional conditions] doctrine"—embodied in the *Nollan*/*Dolan* test—"that protects the Fifth Amendment right to just compensation for property the government takes *when owners apply for land-use permits*." (*Koontz, supra*, 570 U.S. at p. 604, italics added.)

Fatal to plaintiffs' claim, this case does not involve any application for a land-use permit. It involves instead a user fee. (Black's Law Dictionary (11th ed. 2019) ["user fee" means "[a] charge assessed for the use of a particular item or facility"]; see *San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 162 ["a usage fee typically is charged only to those who use the goods or services," with "[t]he amount of the charge . . . related to the actual goods or services provided to the payer"].) And the Supreme Court, apart from explaining that it has not extended the *Nollan*/*Dolan*

14

test beyond the land-use permitting context (*City of Monterey, supra*, 526 U.S. at p. 702), has specifically carved out user fees from this test, explaining in *Koontz* that its reasoning "does not affect the ability of governments to impose property taxes, user fees, and similar laws and regulations that may impose financial burdens on property owners" (*Koontz, supra*, 570 U.S. at p. 615).

Plaintiffs, then, rely on Supreme Court precedent that is inapplicable on its own terms. Attempting to force application of the Supreme Court's *Nollan*/*Dolan* test here, moreover, would make little sense, for this test "was not designed to address, and is not readily applicable to," challenges to user fees. (*City of Monterey*, *supra*, 526 U.S. at p. 703.) Because the *Nollan*/*Dolan* test arose from the "realities of the permitting process" (*Koontz, supra*, 570 U.S. at p. 604), its two considerations are centered on this context. Again, it requires land-use permit conditions (1) to have an essential nexus to the government's land-use interest and (2) to be roughly proportional to the development's impact on this interest. (*Sheetz, supra*, 601 U.S. at pp. 275-276.) But the City has imposed no permit conditions in this case. Nor does this case even involve a development, a development impact, or any impact at all that the City is seeking to address. So absent some modification of the *Nollan*/*Dolan* test, we could not even apply this test to the facts here.

And to the extent plaintiffs believe we should craft a new "special application" of the unconstitutional conditions doctrine to fit this case, we decline to do so. Plaintiffs apparently believe that a modified *Nollan*/*Dolan* test—which would require some sort of essential nexus and rough proportionality—should apply any time the government demands money from a person under threat of a penalty that would impinge on that person's property rights. But that approach has no clear limits. Even a user fee that exceeds the cost of service, but that receives the requisite voter approval under article XIII C, would be subject to this test. And it would fail this test if the fee was not roughly proportional to the cost of service. Article XIII C, then, would be rendered

15

unconstitutional to the extent it allows local governments, with voter approval, to charge fees that are not roughly proportional to the cost of service. Even ordinary property taxes—which the Supreme Court recently reiterated "are not themselves a taking" (*Tyler v. Hennepin County* (2023) 598 U.S. 631, 637)—would also be subject to plaintiffs' modified *Nollan*/*Dolan* test. And unless these taxes satisfied this test, they too would apparently violate the unconditional conditions doctrine, for they would require landowners to pay property taxes under threat of the government seizing and selling their property if the full tax is not paid. (See Rev. & Tax. Code, § 3361.) No court, however, has endorsed this extension of the *Nollan*/*Dolan* test.

For all these reasons, and similar to other courts, we reject plaintiffs' reliance on Supreme Court case law applying the *Nollan*/*Dolan* framework. (See *335-7 LLC v. City of New York* (S.D.N.Y. 2021) 524 F.Supp.3d 316, 320 [finding the Supreme Court's "land-use exaction standard" inapplicable in a challenge to a rent control law, because the court has declined to extend this standard beyond the context of land-use permitting], affd. (2d Cir., Mar. 1, 2023, No. 21-823) 2023 U.S. App. LEXIS 4940; *Salazar v. County of Los Angeles* (C.D. Cal., Sept. 27, 2016, No. CV-15-09003-MWF-JC) 2016 WL 11746844, *1, *12 [finding *Koontz* inapplicable in a challenge to allegedly excessive rates for telephone services, because the plaintiffs were "not land-use permit applicants"; *Koontz* "cannot be read to apply generally to all demands that ring of extortion"]; *MHC Financing Ltd. Partnership v. City of San Rafael* (N.D. Cal., Dec. 5, 2006, No. C 00-3785 VRW) 2006 WL 8431341, *12 [finding the *Nollan*/*Dolan* test inapplicable in a challenge to a rent control law, because the plaintiff "has not sought to develop property . . . ; hence, no land-use exaction has occurred"].)

III

*Remaining Claims*

Lastly, we consider the City's challenge to plaintiffs' remaining two causes of action—their unjust enrichment and declaratory relief claims. Plaintiffs concede that

16

these are not freestanding claims; they are instead contingent on their succeeding on their primary claims under article XIII C and the state and federal takings clauses. In plaintiffs' words, "[a]s the primary claims go, so go these adjunct claims as well." Because we conclude that the trial court should have ruled in the City's favor for these primary claims, we conclude that the court should have ruled in the City's favor for these adjunct claims too.[3]

## DISPOSITION

Let a writ of mandate issue directing the trial court to set aside its order denying the City's motion for summary judgment and to enter a new order granting that motion. The stay of proceedings in the trial court is vacated upon finality of this opinion. The City is entitled to recover its costs. (Cal. Rules of Court, rule 8.493(a).)


                                        /s/                        
                                        BOULWARE EURIE, J.



We concur:


      /s/                        
HULL, Acting P.J.


      /s/                        
DUARTE, J.

_____

[3] The City has filed a motion to strike various parts of plaintiffs' return. But because we conclude that the City is entitled to the relief it seeks, even without considering the motion to strike, we find it unnecessary to consider the issues presented in the motion. (See *Jollie v. Superior Court* (1951) 38 Cal.2d 52, 59.)

17