Filed 1/31/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| HOWARD JARVIS TAXPAYERS ASSOCIATION,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>COACHELLA VALLEY WATER DISTRICT,<br><br>　　　Defendant and Appellant. | E080870<br><br>(Super.Ct.No. RIC1904943)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County. Sunshine S. Sykes and Craig Riemer, Judges. Modified and affirmed.

Colantuono, Highsmith & Whatley, Michael G. Colantuono, Pamela K. Graham and Liliane M. Wyckoff for Defendant and Appellant.

Hanson Bridgett, Claire H. Collins and Sean G. Herman for the League of California Cities, Association of California Water Agencies, California Special Districts Association, California State Association of Counties and California Association of Sanitation Agencies as Amici Curiae on behalf of Defendant and Appellant.

Costell & Adelson Law Corporation, Jeffrey Lee Costell, John M. Haytol; Frost, Joshua S. Stambaugh and Sara McDuffie for Plaintiff and Respondent.

1

The Coachella Valley Water District appeals from a judgment entered against it finding that the rates it charges for Coachella Canal water violated Article XIII C of the California Constitution. It contends that the rates are lawful and that, alternatively, no refund remedy is authorized. We reject both arguments, finding the rates unlawful and that a refund remedy is constitutionally mandated. We modify the judgment in another respect and otherwise affirm.

## I. BACKGROUND

Before turning to this appeal's disputed issues, we first discuss their context, specifically, the construction and financing of the Coachella Canal, the rights of respondent, defendant, and appellant Coachella Valley Water District (the Water District) to obtain water from the Colorado River, and how the Water District's customers pay for that water.

### A. The All-American and Coachella Canals

The All-American Canal is in Imperial County, the southeastern corner of the state. (Stene, Eric A., *All-American Canal: Boulder Canyon Project* (rev. ed. Dec. 2009) for Bureau of Reclamation, p. 2, available at <https://perma.cc/7HYH-7Z8Q> [as of Jan. 23, 2025] (*All-American Canal*).) Beginning at Imperial Dam on the California-Arizona border, the All-American Canal carries water west from the Colorado River for about 80 miles, roughly along the border between the United States and Mexico. (*Id.* at pp. 2, 11.) The Coachella Canal branches off from the All-American Canal and carries water

2

northwest for about 120 miles to the Coachella Valley in Riverside County, ending at Lake Cahuilla. (*Id.* at pp. 2, 28.)

Before the Coachella Canal was constructed, irrigation in the Coachella Valley depended on groundwater, causing groundwater levels to decline. A 2015 report from the Water District (hereinafter History & Development Report) stated that "[b]y 1907, there were approximately 400 wells in the Coachella Valley[,] and by 1913 there were approximately 4,000 acres under cultivation. As more land was irrigated, groundwater levels declined. It was quickly realized that a supplemental water source was necessary or agriculture in the valley would be severely limited."

In 1934, the Water District contracted with the United States Bureau of Reclamation for the construction of the Coachella Canal. Excavation of the Coachella Canal began in 1938, but due in part to World War II materials and labor shortages, the Coachella Canal did not begin delivering water to the Coachella Valley until 1949. (*All-American Canal*, at pp. 16-21.) According to the History & Development Report, Colorado River water was originally intended for groundwater replenishment, but "it soon became apparent that groundwater recharge in the eastern Coachella Valley would be very difficult" and that "an irrigation delivery system would be required." Thus, in 1947, the Water District entered into another contract with the Bureau of Reclamation for the construction of an irrigation distribution system. The contract also provided that the Bureau of Reclamation would build protective works to protect both the Coachella Canal and the irrigation distribution system from alluvial fan flooding.

3

Under the 1934 contract, the Bureau of Reclamation would construct the Coachella Canal, and the Water District would pay the federal government an amount, later determined to be approximately $13.5 million, over 40 years, without interest. The payments were structured as 1 percent of the amount for each of the first five years, 2 percent for each of the next 10 years, and 3 percent for each of the remaining 25 years. Approximately 85 percent of the funds owed to the federal government under the 1934 contract was paid with a property tax the Water District calls the "ID1 tax," the name referring to Improvement District No. 1, a large portion of the Water District's area where the tax is imposed. The remaining 15 percent came from hydroelectric power proceeds. The ID1 tax is an earmarked portion of the 1 percent tax the County of Riverside levies for all taxing local governments under Proposition 13 (as approved by voters, Primary Elec., June 6, 1978). The Water District currently uses ID1 tax revenues for maintenance of the Coachella Canal system.

Like the Coachella Canal itself, the cost of constructing the irrigation distribution system under the 1947 contract was also $13.5 million. (See *United States v. Coachella Valley County Water Dist.* (S.D. Cal. 1953) 111 F.Supp. 172 [describing irrigation distribution system construction and holding, based on terms of the 1947 contract, that Water District need pay only $13.5 million despite actual cost being higher].) The 1947 contract provided that the land the irrigation distribution system would service would be divided into "irrigation blocks," that the cost of construction would be allocated among the irrigation blocks, that a 40-year payment schedule similar to that of the Coachella

4

Canal would apply to each irrigation block (1 percent for each of the first five years, 2 percent for each of the next 10 years, and 3 percent for each of the next 25 years), and that the Water District remained liable for payment if any irrigation block defaulted. However, the History & Development Report states that the irrigation distribution system was paid "utilizing ID1 property taxes," and only approximately 15 percent of the amount due was paid from sources other than ID1 taxes (hydroelectric power proceeds and land sales). The federal government bore the $4.5 million cost of constructing the protective works.

B.     *Colorado River Water, the Seven-Party Agreement, and the Quantification Settlement Agreement*

California's entitlement to Colorado River water comes from the 1922 Colorado River Compact, which "divided the waters of the Colorado River between the Upper- and Lower-basin states, but fell short of apportioning the respective shares among the individual States." (*Arizona v. California* (1983) 460 U.S. 605, 608.) The 1928 Boulder Canyon Project Act (43 U.S.C. § 617 et seq.) "implemented and ratified" the Colorado River Compact and "contained its own formula for allocating Lower Basin water among California, Arizona, and Nevada." (*Bryant v. Yellen* (1980) 447 U.S. 352, 358.) Since then, the United States Supreme Court has repeatedly addressed Colorado River water apportionment issues among the states and various Native American tribes. (See *Arizona v. California*, *supra*, 460 U.S. at pp. 608-612 [describing history]; *Arizona v. California* (2006) 547 U.S. 150, 150-152 [same].)

5

The Water District's entitlement to Colorado River water comes from the 1931 Seven-Party Agreement, which apportions Colorado River water among the Water District and six other agencies in southern California. (See *Boulder Canyon Project Agreement*, Aug. 18, 1931, available at <https://perma.cc/F3XN-KFBD> [as of Jan. 24, 2025] (Seven-Party Agreement).)[1] Under the Seven-Party Agreement, the Water District shares, with the Palo Verde Irrigation District and the Imperial Irrigation District, a third priority and a sixth priority to Colorado River water. The third priority means that the Water District, along with the Imperial Irrigation District and (subject to specific limitations) the Palo Verde Irrigation District, are entitled to use up to 3.85 million acre-feet of water per year "for beneficial consumptive use," minus the amount used by parties in the first and second priorities. (*Id.* at Art. I, § 3.) Then, after the first five priorities have been fulfilled, those three districts (with specific limitations again imposed only on the Palo Verde Irrigation District) can use up to 300,000 acre-feet of water per year, also "for beneficial consumptive use." (*Id.* at Art. I, § 6.) A residual, seventh priority is provided for "all remaining" Colorado River water in California "for agricultural use in the Colorado River Basin in California." (*Id.* at Art. I, § 7.)

The Seven-Party Agreement "apportioned Colorado River water among the various parties by priority but without quantifying exactly how much water each party

---

[1] The other six agencies are the Palo Verde Irrigation District, the Imperial Irrigation District, the Metropolitan Water District of Southern California, the City of Los Angeles, the City of San Diego, and the County of San Diego.

6

was entitled to receive." (*Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 785.) "Thus, for example, while 3,850,000 acre-feet of water per year was apportioned to the first three priorities, the agreement did not specify exactly how much of that water was to go to each of the parties entitled to water under those priorities." (*Ibid.*) "Obviously, this lack of specificity left the potential for future conflict between the parties," but "[e]ven more conducive to future conflict was the fact that the amount of water apportioned in the Seven-Party Agreement . . . was nearly a million acre-feet more than the basic annual allotment of 4.4 million acre-feet of Colorado River water allocated to California in the Boulder Canyon Project Act." (*Ibid.*)

"From 1990 through 1999, California consistently used between 100,000 and 800,000 acre-feet more Colorado River water annually than the 4.4 million acre-feet" allotted to it. (*Quantification Settlement Agreement Cases*, *supra*, 201 Cal.App.4th at pp. 787-788.) "In 1996, the Secretary of the Interior declared that California must implement a strategy to enable the state to limit its annual use of Colorado River water to the promised amount in normal years and to develop alternate means of meeting its water needs without jeopardizing the use or delivery of Colorado River water to other states." (*Id.* at p. 788.) Soon thereafter, "negotiations ensued 'to consensually settle [the] longstanding disputes regarding the priority, use and transfer of Colorado River water.'" (*Ibid.*)

In 2003, the Water District and others signed an agreement known as the Quantification Settlement Agreement as well as dozens of related agreements, the

combined "purpose of which was to 'budget their portion of California's apportionment of Colorado River water among themselves' and to 'provide a framework for conservation measures and water transfers for a period of up to 75 years.'" (*Quantification Settlement Agreement Cases*, *supra*, 201 Cal.App.4th at p. 773.) Under the Quantification Settlement Agreement, or QSA, the Water District's allotment of Colorado River water was capped to 330,000 acre-feet per year subject to certain downward and upward adjustments.[2] The 330,000 acre-feet per year allotment is currently reduced by both (1) the amount of water conserved by lining a portion of the Coachella Canal with concrete, determined to be 26,000 acre-feet per year, that the federal government would deliver to others, and (2) 3,000 acre-feet per year for those whose Colorado River water rights generally predate the Colorado River Compact and Boulder Canyon Project Act. We will refer to this as-reduced allotment of Colorado River water, 301,000 acre-feet per year, as "base QSA water." The Water District's allotment of Colorado River water can also be increased, by varying amounts depending on the year, under several agreements between the Water District and other water agencies.

---

[2] The 330,000 acre-feet per year allocation is the Water District's share of its water under the Seven-Party Agreement's third priority. The Seven-Party Agreement also allocates water to the Water District under the sixth and seventh priorities, but those allocations do not bear on the issues presented in this appeal.

Not all of the Colorado River water the Water District purchases from other agencies is for water delivered via the Coachella Canal, or Canal Water. For example, currently the Water District purchases some Colorado River water from the Metropolitan Water District that is delivered via the Colorado River Aqueduct, which is not connected to the Coachella Canal. Because the QSA grants the Water District the ability to obtain additional water so long as, in general, it does not contravene the QSA's terms, and because most of that water is delivered via the Coachella Canal, we will use the term "supplemental QSA water" to refer to Colorado River water that is both Canal Water and obtained under various agreements as allowed or contemplated by the QSA (i.e., beyond the amount allotted as base QSA water). Supplemental QSA water is typically, but not always, obtained through purchases from other agencies.

The amounts the Water District pays other agencies for supplemental QSA water is significant in both amount and importance here. It is significant in amount, as the Water District spends millions per year for supplemental QSA water. In fiscal year 2019, it spent over $4 million for supplemental QSA water, and in fiscal year 2020, it spent over $5 million for such water. It is also significant in importance, as a central question of this appeal is whether allocating those costs solely to non-agricultural water customers satisfies constitutional requirements.[3]

_____

[3] The Water District also pays what it calls QSA mitigation costs, which are designed to "resolve and allocate responsibility between the [Imperial] Irrigation District, [the] San Diego [County Water Authority], and [the Water District] for environmental

9

*C.	Canal Water*

Canal Water is mainly used for agriculture, golf courses, and groundwater replenishment. Although the data in the appellate record is sparse, it appears that in the past several years, approximately 75 percent of Canal Water has been used for agriculture and 18 percent for groundwater replenishment. Draft internal documents from the Water District suggest that golf courses have used roughly six percent of Canal Water during that time.

Domestic customers, whom petitioner, plaintiff, and respondent Howard Jarvis Taxpayers Association (Howard Jarvis) represents, are not directly billed for Canal Water. However, they do cause Canal Water to be used, and the cost of Canal Water is reflected in their bills indirectly. The Water District provides potable (drinkable) water to its domestic customers, and the area's main source of such water is groundwater. However, because groundwater is a limited resource in a desert region, groundwater conservation and replenishment are necessary. Broadly speaking, because domestic customers use groundwater, they are responsible for contributing to groundwater replenishment.

Domestic customers indirectly pay for Canal Water through the Water District's interfund transfers. The Water District accounts for revenues and expenses attributable to

mitigation relating to" some of the related agreements under the Quantification Settlement Agreement. (*Quantification Settlement Agreement Cases*, *supra*, 201 Cal.App.4th at p. 789.) However, those costs are not paid for by Canal Water proceeds and are therefore not at issue here.

10

its various services through enterprise funds. An enterprise fund is "a budgetary device 'used to track monies received and expended for municipal services where fees or charges to the users of those services pay wholly or in part for such services.'" (*Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 5-6 (*Citizens for Fair REU Rates*).) Along with having an enterprise fund for domestic water and Canal Water, the Water District has enterprise funds for sanitation (or sewer) service, flood control, and groundwater replenishment. Although domestic customers do not see a line item for Canal Water in their bills, public documents from the Water District state that the domestic water fund pays—and thus domestic customers pay—replenishment fees to three groundwater replenishment funds, one for each of the areas of benefit. (See *Howard Jarvis Taxpayers Assn. v. Powell* (2024) 105 Cal.App.5th 955, 961 ["The Water District divides its service area into three areas of benefit: the East Whitewater River Subbasin area, the West Whitewater Subbasin area, and the Mission Creek Subbasin area"].)[4] A portion of those fees is then paid to the Canal Water fund for purchasing supplemental QSA water.

### D. Procedural History

In 2019, after submitting a government claim that the Water District rejected, Randall Roberts filed a combined petition and putative class action complaint against the

---

[4] For example, in each of the 2019 and 2020 fiscal years, the domestic water fund spent roughly $12 million in "Replenishment Charges," approximately 15 percent of the fund's total expenses.

11

Water District. He alleged that "even though the cost of service is substantially the same," "Class 1" customers of Canal Water, meaning those who use such water "for commercial agricultural activities," are charged $34.32 per acre-foot, while "Class 2" customers, or all others who use Canal Water, are charged $102.12 per acre-foot. Because the Class 2, non-agricultural rate was passed "without prior voter approval," it violated the California Constitution, including Proposition 218 (as approved by voters, Gen. Elec. (Nov. 5, 1996)) and Proposition 26 (as approved by voters, Gen. Elec. (Nov. 2, 2010)).[5] The suit was on behalf of all "non-agricultural water customers . . . who directly or indirectly paid 'Class 2' Canal Water rates," and it sought both a writ directing the Water District to stop enforcement of the rate structure and a refund of all amounts collected for Class 2 rates.

In 2020, Roberts filed a first amended petition and complaint, which redefined the putative class as "domestic water customers of [the Water District] who have paid and/or pay 'Class 2' Canal Water rates," named additional defendants, and included other causes of action. Some of those additional causes of action and all of the additional defendants were later dismissed at Roberts's request.

The Water District demurred to the first amended petition and complaint. In part, the Water District argued that Roberts lacked standing because he did not bear the legal incidence of the Class 2 rate, but only its economic incidence. The Water District also

---

[5] We discuss Propositions 218 and 26 in section II. B. below.

12

argued that the Class 2 rate was an expense of the domestic water fund and that expenditures of funds were not subject to Propositions 218 or 26. The trial court overruled the demurrer on these grounds.[6]

Howard Jarvis then substituted in as lead plaintiff for Roberts. The operative pleading, the second amended petition and complaint filed by Howard Jarvis, contains four causes of action: writ of mandate, violations of the California Constitution, violations of the United States Constitution, and declaratory relief. As Howard Jarvis alleges, in 2015, the Water District's consultants prepared a preliminary cost of service study recommending that the Water District charge one uniform Canal Water rate for all customers. In response, the Water District instructed its attorney to prepare a legal memorandum justifying the Class 1 and Class 2 rates on a "historical priority" theory that "farmers are entitled to free . . . Canal Water." The Water District also sought to have its consultants revise the cost of service study to favor agricultural interests, including those owned by a majority of the Water District's Board of Directors. As a result, under the two-tiered rate structure that was then passed, all supplemental QSA water costs are allocated to Class 2 ratepayers, and domestic water customers are forced to subsidize "the

---

[6] The trial court sustained the demurrer with leave to amend as to a cause of action for violations of the California Water Code, which Roberts later abandoned. The trial court otherwise overruled the demurrer, either on substantive grounds or because Roberts had requested to dismiss some of the causes of action while the demurrer was pending. The Water District petitioned for a writ of mandate in this court seeking review of the demurrer ruling, which we summarily denied, and a subsequent writ of review in the California Supreme Court, which was denied as well.

interests of [a] few large agricultural property owners" in violation of the California and United States Constitutions.

In November 2021, Judge Sykes held that "the Canal Water rates and the Irrigation Water Availability Assessment" violated Proposition 218.[7] She stated that the Water District's argument "rest[ed] almost entirely on a historical argument," which she found to be "not persuasive, grounded in legal precedent, or sufficient to meet" the Water District's burden. Additionally, the Water District's reliance on its historical priority argument meant that it "has made no attempt whatsoever to show that the Canal Water Rates charged to Class 1 and Class 2 customers comply" with the California Constitution. Judge Sykes deferred ruling on remedies and directed the parties confer regarding a future hearing date.

The parties disputed the necessity of expert testimony to determine damages. The Water District argued that Class 2 customers were entitled to the difference between what they actually paid for Canal Water and a rate "they lawfully might have paid." According to the Water District, that determination required expert opinion. Howard Jarvis disagreed, arguing that Class 2 customers were entitled to the difference between what they paid and the rate they would have been charged had the cost of supplemental QSA water been allocated proportionally between the classes based on their relative consumption of Canal Water. Moreover, such proportional allocation was easy to

---

[7] We discuss the Irrigation Water Availability Assessment in section II. B. 3. below.

14

calculate and did not require expert testimony.  In an August 2022 order, Judge Riemer, assigned to the case after Judge Sykes left the court, agreed with Howard Jarvis on both issues.  The order also noted the parties' agreement that any monetary recovery would be limited to the period beginning on March 7, 2018, which was one year before Roberts filed a government claim.

The August 2022 order sought additional clarification from the parties and directed them to file a joint statement regarding several outstanding issues.  The parties filed a joint statement, in which the Water District raised a new argument based on new caselaw construing Health and Safety Code section 5472.  The trial court invited supplemental briefing on Health and Safety Code section 5472, and both sides submitted briefs.  At around the same time, Howard Jarvis filed a validation action challenging the Canal Water rates approved for fiscal year 2023, which was consolidated with this case.

In January 2023, Judge Riemer issued a second order.  He determined that, per the parties' agreement, the relief to be awarded Class 2 customers "through the end of Fiscal Year 2022" was approximately $17.5 million but that damages continued to accrue.  He found that Howard Jarvis was not entitled to any monetary remedy as a result of the invalid Irrigation Water Availability Assessment.  He also found that former customers would receive compensation from a common fund the Water District would establish and that current customers would receive bill credits.  The January 2023 order directed the parties to meet and confer and file a joint statement regarding the remaining issues of the amount of relief to be awarded through entry of judgment and the total amount of interest

15

on the award.  The order also instructed the parties to meet and confer on a proposed judgment, writ of mandate, and order of dismissal of class claims.[8]

The parties filed a joint statement in February 2023.  Although the parties continued to dispute certain issues, the only one relevant to this appeal was whether the judgment and writ of mandate should encompass both Class 1 and Class 2 rates or only Class 2.  In a tentative ruling that same month, Judge Riemer reviewed the operative complaint and Judge Sykes's ruling and stated that the judgment would declare both Class 1 and Class 2 rates to be invalid.

Judgment was entered in March 2023.  It held that the Irrigation Water Availability Assessment and both "Class 1 and Class 2 Canal Water Rates" violated Proposition 218 and were invalid.  It permanently enjoined the Water District from charging "its current Class 1 and Class 2 Canal Water Rates" and ordered that any "Canal Water Rates and Charges . . . imposed by [the Water District] in the future shall comply with the requirements of Proposition 218."  It awarded Class 2 customers $17,454,603 for invalid charges from March 2018 through June 2022, $314,754 for interest accrued through June 2022, and additional amounts determinable by a formula for charges and

---

[8]  The January 2023 order noted the parties' agreement that complete relief could be awarded to all affected Class 2 customers without the need for formal class certification.  On that basis, the trial court stated it would enter a judgment without deciding the issue of class certification and that the judgment would include a dismissal of the class claims without prejudice.

interest since June 2022.  In a separate order, Judge Riemer dismissed the putative class claims without prejudice.  The writ of mandate is not part of the appellate record.[9]

## II.  DISCUSSION

On appeal, the Water District contends that the trial court erred in both its liability and remedies rulings.  Our discussion is split into three parts.  First, we address the threshold issue of standing, which does not require an understanding of Propositions 216 and 28.  Second, we discuss those propositions and consider the Water District's liability arguments.  Third, we address the Water District's arguments relating to remedies.  We hold that Howard Jarvis had standing, that the historical priority argument advanced by the Water District does not justify the Class 2 rates, and that availability of monetary relief is required for violations of Proposition 218.

*A.    Standing*

The Water District contends that neither Howard Jarvis nor any of the domestic customers it represents has standing.  According to the Water District, only those who are

---

[9] This appeal is the fourth between Howard Jarvis and the Water District (or parties associated with the Water District) that we have recently decided.  First, we held that the validation statutes (Code Civ. Proc., §§ 860-870) applied to the Water District's ad valorem property tax.  (*Coachella Valley Water District v. Superior Court of Riverside County* (2021) 61 Cal.App.5th 755.)  Then, we held that the Water District's interfund loan did not violate Propositions 26 and 218.  (*Howard Jarvis Taxpayers Association v. Coachella Valley Water District* (Feb. 10, 2023, E078411) [nonpub. opn.].)  More recently, we held that the public interest exemption did not apply to an anti-SLAPP motion brought by the Water District's board of directors, general manager, and consultants.  (*Howard Jarvis Taxpayers Association v. Powell*, *supra*, 105 Cal.App.5th 955.)

directly obligated to pay the Class 2 rates have standing to challenge them and that neither Howard Jarvis nor the domestic customers it represents was ever directly obligated to pay them. The Water District concedes that domestic customers paid Class 2 rates indirectly by paying replenishment assessment charges.

In *Zolly v. City of Oakland* (2022) 13 Cal.5th 780 (*Zolly*), our Supreme Court rejected the argument the Water District makes here. *Zolly*, which also dealt with Propositions 218 and 26, noted that nothing in those propositions limits standing to those who are directly liable to pay a given tax. (*Id.* at pp. 789-790.) As a result, claims of economic injury, such as "'lost money or property,'" were sufficient to confer standing. (*Id.* at p. 789; see *id.* at p. 790 ["In light of plaintiffs' allegations of an economic injury caused by the challenged fees, we hold that plaintiffs have standing to file this suit."].) The Court thus rejected the local government's argument that the plaintiffs "lack standing because they are not 'directly obligated' to pay" the rate in question. (*Id.* at p. 789.) Here, because domestic customers pay Class 2 rates indirectly, they also suffer economic injury through lost money.

The Water District attempts to distinguish *Zolly*, noting it dealt with a franchise fee and arose on demurrer. The Water District does not attempt, however, to explain why either of those differences is significant. *Zolly* dealt with standing under Propositions 218 and 26, as does this case, so without more, the fact that *Zolly* involved a challenge to a franchise fee is not a basis for distinguishing it. Furthermore, although on demurrer a court generally accepts factual allegations as true (*Quelimane Co. v. Stewart Title*

18

*Guaranty Co.* (1998) 19 Cal.4th 26, 34, fn. 3) and we in contrast may reject a factual finding as unsupported, the Water District does not challenge the trial court's finding that domestic water customers indirectly paid Class 2 Canal Water rates. As Judge Sykes noted in her ruling, the Water District conceded that "'Domestic users do benefit from canal supplies and pay for that benefit appropriately.'"

The Water District relies on two cases rejecting standing based on a lack of direct obligation to pay a tax, but such reliance is misplaced. (See *Torres v. City of Yorba Linda* (1993) 13 Cal.App.4th 1035; *Cornelius v. Los Angeles County Metropolitan Transportation Authority* (1996) 49 Cal.App.4th 1761.) Those cases concerned standing under Code of Civil Procedure section 526a, which, as *Zolly* noted, creates "a specific statutory cause of action" and "limit[s] standing to an individual '"who is assessed for and is liable to pay . . . a tax"' in a given '"county, town, city, or city and county of the state."'" (*Zolly*, *supra*, 13 Cal.5th at p. 790.) The Water District's reliance on other cases is similarly unavailing. *McClain v. Sav-On Drugs* (2019) 6 Cal.5th 951 did not involve standing at all. And *County Inmate Telephone Service Cases* (2020) 48 Cal.App.5th 354 (*County Inmate*), which stated a "general rule . . . that a person may not sue to recover excess taxes paid by someone else" (*id.* at p. 360), was called into question by *Zolly*, which called *County Inmate*'s rule "for a general limitation on standing in all cases where plaintiffs seek a tax refund, without regard to the specific form of tax at issue," as "misplaced." (*Zolly*, *supra*, 13 Cal.5th at p. 790.) We therefore find that Howard Jarvis has standing to challenge the Class 2 rates here.

19

## B.    Liability Ruling

### 1.    Basis for Class 2 Rates

The central issue about the liability ruling is whether the Class 2 rates are "taxes" as defined by the California Constitution or instead fall within an exception to the term. If the Class 2 rates are taxes, then they are invalid, as the Water District did not follow the required procedures when enacting them. We first examine the applicable law: the California Constitution as amended by Propositions 218 and 26. We then discuss why the Class 2 rates do not fall under an exception and thus are invalid taxes.

"Through a series of ballot initiatives, California voters have imposed several constitutional limitations on the ability of local governments to tax." (*Zolly*, *supra*, 13 Cal.5th at p. 784.) The earliest of these voter initiatives, Proposition 13, was enacted in 1978 to cut local property taxes. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 836 (*Apartment Association*).) "'Its principal provisions limited ad valorem property taxes to 1 percent of a property's assessed valuation and limited increases in the assessed valuation to 2 percent per year unless and until the property changed hands.'" (*Ibid.*) "[T]o prevent tax savings related to real property from being offset by increases in state and local taxes," Proposition 13 also "required approval by two-thirds of the members of the Legislature in order to increase state taxes" as well as "approval by two-thirds of the local electors of a city, county, or special district in order for such a local entity to impose special taxes." (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 258.) Proposition 13 did not define "special

20

district," and in *Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197, our Supreme Court held that the term was limited to governmental bodies that have the power to levy property taxes. (*Id.* at p. 201.)

In 1996, the electorate adopted Proposition 218, part of which further limited "the authority of local governments to assess taxes and other charges on real property." (*Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 10.) Under Article XIII D of the California Constitution, added by Proposition 218, only 4 types of local property taxes are allowed: "'(1) an ad valorem property tax; (2) a special tax; (3) an assessment; and (4) a [property-related] fee or charge.'" (*Apartment Association*, *supra*, 24 Cal.4th at p. 837.)[10] To limit the ways local government could raise revenue "*not* based on real property value or ownership," Proposition 218 also added Article XIII C. (*Citizens for Fair REU Rates*, *supra*, at p. 10, italics added.) Article XIII C provides that all taxes imposed by any "local government" are either general taxes or special taxes, requires that a general tax be approved by a majority of the electorate (and special tax by a two-thirds majority), and defines the term "local government" broadly to mean "any county, city, city and county, . . . any special district, or any other local or regional government entity." (Cal. Const., Art. XIII C, §§ 1-2.) Proposition 218 "specifically state[d] that '[t]he provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent.'" (*Silicon Valley*

---

[10] Undesignated article references are to the California Constitution.

*Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448 (*Silicon Valley*), citing Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, § 5, p. 109.)

"Significantly, Proposition 218 did not define the term 'tax.'" (*Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 11.) "That definition was provided 14 years later, with the passage of Proposition 26 in November 2010." (*Ibid.*) Proposition 26 defined the term "broadly, to include 'any levy, charge, or exaction of any kind imposed by a local government.'" (*Ibid.*, citing Art. XIII C, § 1, subd. (e).) "However, the new definition has seven exceptions. A charge that satisfies an exception is, by definition, not a tax." (*Citizens for Fair REU Rates*, *supra*, at p. 11.)

Thus, the California Constitution currently broadly defines the term tax, requires that a tax be approved by at least a majority of voters, and carves out exceptions from the definition of a tax. A challenge based on Propositions 218 and 26 therefore "involves three questions: (1) Is the [subject of the challenge] a levy, charge, or exaction imposed by a local government?; (2) Does it satisfy an exception to the definition of tax?; and (3) If it does not, was it properly approved by the voters?" (*Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 12.) A levy, charge, or exaction imposed by a local government—which we will refer to simply as an exaction—that does not satisfy an exception and was not properly approved by the voters is an unconstitutional, invalid tax.

There is no dispute here that the Class 2 rate is an exaction. There is also no dispute that the Class 2 rate was not approved by a majority of the electorate.

22

Accordingly, whether the Class 2 rate is valid depends solely on whether it satisfies an exception to the definition of a tax. "The local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax." (Cal. Const., Art. XIII C, § 1, subd. (e), unenumerated par.) We independently review whether an exaction is a tax. (*Silicon Valley*, *supra*, 44 Cal.4th at pp. 448-449; *City of San Buenaventura v. United Water Conservation District* (2022) 79 Cal.App.5th 110, 117-119.)

The Water District argues the Class 2 rates are not taxes because it "has rational basis to assign urban customers the cost to import QSA water in excess of" the amount of base QSA water—in other words, the cost of supplemental QSA water. We evaluate the Water District's argument under two potentially applicable exceptions: Article XIII C, section 1, subdivision (e)(7), which excludes "[p]roperty-related fees imposed in accordance with the provisions of Article XIII D," and subdivision (e)(2) of the same section, which excludes "charge[s] imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product." We find that neither exception applies.

### a. Property-Related Fees

Article XIII D, section 6 imposes various requirements for property-related fees. Those requirements include, for example, that revenues derived from the fee or charge "shall not exceed the funds required to provide the property related service" and "shall

23

not be used for any purpose other than that for which the fee or charge was imposed." (Art. XIII D, § 6, subd. (b)(1), (b)(2).) The only requirement in dispute here, however, is that "[t]he amount of a fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel." (Art. XIII D, § 6, subd. (b)(3).)

The Water District's argument is that the Class 2 rate does not exceed the proportional cost of providing non-agricultural customers Canal Water. This is so, as the Water District would have it, because non-agricultural customers are the only reason that the Water District must purchase expensive supplemental QSA water. It argues that it "allocates the cost of supplemental QSA water to those who need it – non-agriculture land uses developed since the 1935 and 1947 [c]ontracts were performed." The Water District's argument is based on history, which it views as supporting differently allocating—on paper—QSA water between agricultural and non-agricultural customers. The history, it argues, supports allocating the cheap cost of base QSA water solely to agricultural customers and the expensive cost of supplemental QSA water solely to non-agricultural customers.

The Water District's argument depends in part on its factual claim that "owners of farmland paid supplemental property taxes" to build the Coachella Canal and irrigation distribution system. From this premise, the Water District views agricultural customers as the only ones entitled to base QSA water. The idea is that agricultural customers do not drive supplemental QSA water demand because they use no more than the base QSA

24

water amount, which they are entitled to use because they paid all (or substantially all) the costs of the Coachella Canal and irrigation distribution system.

The Water District's argument also rests on an implicit claim that agricultural customers use no groundwater. This is because if they use groundwater, the replenishment funds must obtain water for replenishment, and the replenishment funds can obtain that water only by purchasing supplemental QSA water (because replenishment funds are not agricultural customers).[11]

The record does not substantiate the Water District's claims. The supplemental tax the Water District refers to, the ID1 tax, has been assessed on all property within the 137,000 acre area of Improvement District No. 1 since 1950. The Water District's History and Development Report shows how much in ID1 taxes went toward payments to the federal government for construction of the Coachella Canal and irrigation distribution system each year over each structure's repayment period. However, the report also states that "[d]etailed land valuation and property tax information is not readily available" for those periods, so no data shows how much ID1 taxes during those periods were paid by agricultural customers as opposed to non-agricultural ones. In contrast, from the 1998 through the 2015 fiscal years, the History and Development Report shows that non-agricultural customers paid $30,580,693 in ID1 taxes, more than 17 times the $1,730,472 that agricultural customers paid. Thus, the evidence does not support the claim that only

---

[11] The parties have not pointed to anything in the record showing what happens to base QSA water that is allocated but not used by Class 1 agricultural customers.

agricultural customers paid for the Coachella Canal and irrigation distribution system using ID1 taxes.

Other parts of the record undermine the idea that only agricultural customers were meant to pay, and did pay, for the Coachella Canal and irrigation distribution system. About 15 percent of the money paid to the federal government for construction of the Coachella Canal came from hydroelectric power proceeds. A similar amount paid for construction of the irrigation distribution system came from non-ID1 sources. The payments for both the Coachella Canal and irrigation distribution system were small at first and spread out over 40 years, during which time—as the Water District acknowledges in its brief—the population of the area rapidly grew. And under the Seven-Party Agreement, which predates the 1934 and 1947 contracts with the Bureau of Reclamation, the Water District was allowed Colorado River water for broader, "beneficial consumptive use," with only residual water reserved for narrower "agricultural use." (Seven-Party Agreement, Art. I, §§ 3, 6-7.)

The Water District does not cite evidence showing how much of the Coachella Canal and irrigation distribution system were paid for by agricultural customers, so there is no record support for the claim that agricultural customers paid for substantially all the structures' costs.

Nor is there any evidence that agricultural customers use no groundwater. In claiming that "agricultural customers have consistent (and falling) water demands," the Water District cites reports from two of its retained experts. These expert reports were

prepared during the remedies phase, after the trial court had made its liability ruling, so it is not appropriate for us to consider them here. (Cf. *Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 912 ["we do not take new evidence" on independent review].) In any event, the reports show only how much Canal Water agricultural customers have used in recent years. They say nothing about the amount of groundwater agricultural customers use. As discussed above, if agricultural customers use significant amounts of groundwater, then they help drive supplemental QSA water demand, and the Water District's claim that only "non-agricultural land uses developed since the 1935 and 1947 [c]ontracts" "need" supplemental QSA water is not accurate.

There are two reasons, then, why the Water District fails to demonstrate that the Class 2 rate non-agricultural customers pay for Canal Water does not exceed the proportional cost of providing them that water. The first is that the Water District has not shown that fully allocating base QSA water to agricultural customers is supported by the record. Any base QSA water properly allocable to non-agricultural customers would lower the cost of providing those customers Canal Water. The second is that the Water District has not shown that agricultural customers do not increase demand for supplemental QSA water. If agricultural customers drive some portion of supplemental QSA water demand, then the full cost of obtaining supplemental QSA water should not

27

be borne by non-agricultural customers.  The Class 2 rate can therefore not be properly considered a property-related fee.[12]

          b.      *Charges for Specific Government Services or Products Not Exceeding Reasonable Costs*

Article XIII C, section 1, subdivision (e)(2) (subdivision (e)(2)) provides an exception from the term "tax" any "charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product."  This has been described as the "aggregate cost" requirement.  (*City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1212.)  Under an unenumerated paragraph in Article XIII C, section 1, subdivision (e), the local

---

[12] The Water District has filed a notice of new authority, informing us that two bills pertaining to Article XIII D, section 6 were signed into law in September 2024.

Senate Bill No. 1072 (2023-2024 Reg. Sess.) adds section 53758.5 to the Government Code and states in part:  "If a court determines that a fee or charge for a property-related service, including water, sewer, and refuse collection, violates Section 6 of Article XIII D of the California Constitution, then the local agency shall, in the next procedure to impose or increase the fee or charge, credit the amount of the fee or charge attributable to the violation against the amount of the revenues required to provide the property-related service unless a refund is explicitly provided for by statute."  (Gov. Code, § 53758.5, subd. (a).)  No issue pertaining to that new law is currently before us.

Assembly Bill No. 1827 (2023-2024 Reg. Sess.) adds section 53750.6 to the Government Code and states in part:  "The incrementally higher costs of water service associated with higher water usage demands . . . may be allocated using any method that reasonably assesses the water service provider's cost of serving those parcels that are increasing potential water usage demand."  (Gov. Code, § 53750.6, subd. (b)(1).)  The new provision also states that it is "declaratory of existing law."  (Gov. Code, § 53750.6, subd. (c).)  Our analysis under existing law, therefore, is unchanged, and for the reasons described above, we find that the supplemental QSA rates were not so allocated.

government must also prove that "the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor's burdens on, or benefits received from, the governmental activity." This has been described as the "allocation" requirement. (*City of San Buenaventura v. United Water Conservation Dist.*, *supra*, at p. 1212.) To fall under the exception, an exaction must satisfy both requirements. (*Id.* at p. 1214.)

For the same reasons discussed above with respect to Article XIII C, section 1, subdivision (e)(7) (subdivision (e)(7)), the Class 2 rate fails the allocation inquiry of subdivision (e)(2). That is, by allocating none of the benefit that comes from the less expensive base QSA water to non-agricultural customers without justification, and by allocating the full cost of supplemental QSA water to non-agricultural customers without demonstrating that agricultural customers drive no demand for supplemental QSA water, the Water District has not shown that its allocation bears a fair or reasonable relationship to non-agricultural customers' burdens on obtaining Canal Water.

The Water District claims that Howard Jarvis only raised subdivision (e)(7) in trial court and did not raise subdivision (e)(2). This is incorrect, as Howard Jarvis raised both subdivisions in trial court. Additionally, the Water District contends that subdivision (e)(2)'s exception applies so long as the charge does not exceed the reasonable cost to the local government. This is also incorrect, as it ignores the allocation inquiry altogether. (*City of San Buenaventura*, *supra*, 3 Cal.5th at p. 1212 ["the aggregate cost inquiry and the allocation inquiry are two separate steps in the analysis"].) Accordingly, for much of

29

the same reasons the exception in subdivision (e)(7) does not apply, the exception in subdivision (e)(2) does not apply.

### c.     *The Water District's Arguments*

In arguing that the Class 2 rate was justified, the Water District asserts that "rational basis" is "all the law requires." However, this is not the applicable standard. In *Silicon Valley*, our Supreme Court noted that "[b]efore Proposition 218 was passed, courts reviewed quasi-legislative acts of local governmental agencies . . . under a deferential abuse of discretion standard." (*Silicon Valley*, *supra*, 44 Cal.4th at p. 443.) "The drafters of Proposition 218," however, "specifically targeted this deferential standard of review for change." *(Id.* at p. 444.) "Because Proposition 218's underlying purpose was to limit government's power to exact revenue and to curtail the deference that had been traditionally accorded legislative enactments on fees, assessments, and charges, a more rigorous standard of review [was] warranted." (*Id.* at p. 448.) As a result, our Supreme Court held that "Proposition 218 requires courts to make an independent review of local agency decisions." (*Id.* at p. 437.) Courts have extended the independent review standard of *Silicon Valley* to claims concerning whether a given exaction is a tax under Article XIII C (as amended by Proposition 26) as well. (See *City of San Buenaventura v. United Water Conservation District*, *supra*, 79 Cal.App.5th at pp. 117-119 [rejecting rational basis standard in favor of independent review because "Propositions 218 and 26 have the same underlying purpose"].)

The Water District does not attempt to distinguish *Silicon Valley* or argue that cases extending its rationale were wrongly decided. Instead, it cites two cases applying rational basis review to an equal protection challenge. *Johnson v. County of Mendocino* (2018) 25 Cal.App.5th 1017, the first case cited, noted that "'[t]he threshold for tax legislation to pass constitutional muster against an equal protection challenge is very low.'" (*Id.* at p. 1032, fn. 7.) *Jensen v. Franchise Tax Bd.* (2009) 178 Cal.App.4th 426, the second case the Water District relies on, similarly observed that "'"[w]here taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation."'" (*Id.* at p. 436, citing *Kahn v. Shevin* (1974) 416 U.S. 351, 355.) There is no equal protection challenge before us, so those cases do not apply.

The Water District also argues that Howard Jarvis "did not attempt to show Class 2 customers [were] overcharged." That argument assumes, however, that Howard Jarvis had the burden of proof on the issue at all. It did not. Article XIII C, section 1, subdivision (e) provides that the "local government bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax." It was thus on the Water District to show that non-agricultural, Class 2 customers were charged a proper amount, not the other way around.

Finally, the Water District argues that Class 2 customers were not overcharged for Canal Water because their water rates are heavily subsidized by revenues from other

31

taxes. We reject this argument, raised for the first time at oral argument, as forfeited. (See *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1554, fn. 9.) It also lacks factual support. The argument might have merit if supplemental QSA water costs could justifiably be allocated solely to Class 2 customers. Then, if rates were subsidized such that Class 2 customers paid less per acre-foot of water than the total cost of purchasing an acre-foot of supplemental QSA water (plus any costs associated with distributing that water to customers or using it for groundwater replenishment), we could conclude that the rates Class 2 customers pay do not exceed the proportional cost of service. (See *Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 18 [local electric utility's rate not a tax because "[t]otal rate revenue was less than the concededly reasonable costs of providing electric service"].) However, as discussed above, the Water District has failed to justify allocating supplemental QSA water costs solely to Class 2 customers. As a result, there must be evidence showing what the proportional cost of service to Class 2 customers is. We know only that the proportional cost is not the total cost. Without information about what the proportional cost of service to Class 2 customers is, a court cannot determine whether a given rate exceeds that cost.

### 2. Expenditures

The Water District next argues that the Class 2 rates are expenditures of funds that are acceptable under *Webb v. City of Riverside* (2018) 23 Cal.App.5th 244 (*Webb*) and *Citizens for Fair REU Rates*. As we discuss, however, those cases do not apply here.

In *Webb*, the City of Riverside operated an electric utility and was allowed to transfer up to 11.5 percent of the utility's "gross operating revenue[]" per year from its enterprise fund to the city's general fund. (*Webb*, *supra*, 23 Cal.App.5th at p. 248.) After the city decided in 2013 to begin listing all of a certain type of income ("transmission revenue requirement" income) in gross operating revenue, thus increasing the amount of the interfund transfer, the plaintiff sued, alleging that the methodology change constituted an unconstitutional general tax increase. (*Id.* at pp. 248, 258; see Art. XIII C, § 2, subd. (b) ["No local government may impose, extend, or *increase* any general tax unless and until that tax is submitted to the electorate and approved by a majority vote"], italics added.) The trial court sustained the city's demurrer, and the Court of Appeal affirmed, holding that if the change "does not increase the amount levied on Riverside taxpayers, it is not a tax increase." (*Webb*, *supra*, at p. 260.) Because "Riverside ratepayers ha[d] experienced no increases in billing charges" since the inclusion of transmission revenue requirement income in gross operating revenue, the interfund transfer did not qualify as a tax increase. (*Ibid.*)

*Citizens for Fair REU Rates* also involved a transfer from a local electric utility's enterprise fund to a city's general fund, and there our Supreme Court similarly held that the budgetary transfer at issue was not a tax. (*Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at p. 4.) That budgetary transfer was a "'payment in lieu of taxes'" representing the amount the city's electric utility "would pay in property taxes under Proposition 13 if it were a private enterprise, rather than a city department." (*Id.* at p. 6.) *Citizens for Fair*

*REU Rates* agreed with *Webb* that it is the "*rate* charged by the utility as the "'levy, charge, or exaction'"'" that is potentially a tax, not the interfund transfer itself.  (*Citizens for Fair REU Rates*, *supra*, at pp. 14-15, citing *Webb*, *supra*, 23 Cal.App.5th at p. 258.)

Here, the Class 2 rate is a rate charged by the Water District for the delivery of Canal Water; it is therefore "subject to article XIII C's restrictions."  (*Citizens for Fair REU Rates*, 6 Cal.5th, *supra*, at p. 15.)  It is not an amount imposed on a utility, as in *Citizens for Fair REU Rates*, nor is it a change in methodology, as in *Webb*.  (See *AB Cellular LA, LLC v. City of Los Angeles* (2007) 150 Cal.App.4th 747, 763 ["'methodology' . . . refers to a mathematical equation for calculating taxes that is officially sanctioned by a local taxing entity"], cited in *Webb*, *supra*, 23 Cal.App.5th at p. 259.)  It is also not an interfund transfer.  As a result, neither *Webb* nor *Redding* authorizes the Class 2 rate.

The Water District construes *Webb* and *Citizens for Fair REU Rates* as holding that any "use" of rates is "immune from challenge."  However, such a construction sweeps far too broadly.  All a utility's expenses are "uses" of rates that customers pay to the utility in the sense that the utility uses money it receives from customers to cover expenses.  Contrary to what the Water District argues, the relevant question here is not whether a rate has been "used" to pay some expense of the utility, directly or indirectly.  Rather, it is whether a rate has led to an increase in billing charges.  (*Webb*, *supra*, 23 Cal.App.5th at p. 260.)  As the Water District bears the burden of proof in demonstrating that the Class 2 rate is not a tax (Cal. Const., art. XIII C, § 1, subd. (e), unenumerated

par.), it must show that the Class 2 rate has *not* led to an increase in billing charges to prevail under *Webb* and *Redding*. (See *Citizens for Fair REU Rates*, *supra*, 6 Cal.5th at pp. 17-18 [local electric utility demonstrated that rate imposed on customers was not a tax].) The Water District has not done so here, instead claiming only that Howard Jarvis needed to have shown that billing charges in fact increased. Such an argument incorrectly flips the burden of proof. The Water District's argument pertaining to *Webb* and *Citizens for Fair REU Rates* therefore fails.

### 3. IWAA

The Water District's final argument as to Judge Sykes's liability ruling relates to the Irrigation Water Availability Assessment, or IWAA. On top of challenging the Canal Water rates, Howard Jarvis challenged the IWAA on the ground that it was a property-related charge exceeding the proportional cost of the service attributable to the parcel. (See Art. XII D, § 6, subd. (b)(3).)

The IWAA is a standby charge enacted under the Uniform Standby Charge Procedures Act (Gov. Code, § 54984 et seq.). Used to help defray the Water District's ongoing operation and maintenance costs relating to the Coachella Canal and appurtenant structures, the IWAA is imposed on all eligible parcels that receive or could receive Canal Water. However, the amount of IWAA a customer pays is reduced by any amounts the customer pays for Canal Water. Thus, as the Water District characterizes it, the IWAA is effectively a "take or pay" charge for Canal Water.

35

Howard Jarvis challenged the IWAA as an improper property-related charge, but as Judge Sykes correctly noted in her ruling, the IWAA is an "assessment" under Proposition 218. (See Art. XIII D, § 6, subd. (b)(4) ["Standby charges, whether characterized as charges or assessments, shall be classified as assessments"].) Judge Sykes nevertheless held that the IWAA violated Proposition 218 because the Water District did not provide "any evidence that the IWAA is equal to the proportional cost of the service attributable to Canal Water delivery to the customers who pay" it.

The Water District argues that the IWAA ruling was erroneous because the Water District did not need to show the IWAA was proportional to the cost of water delivery and because Howard Jarvis's IWAA challenge was not in a separately captioned section in its opening brief in trial court. Neither argument has merit.

"In any legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate . . . that the amount of any contested assessment is proportional to . . . the benefits conferred on the property or properties in question." (Art. XIII D, § 4, subd. (f).) Even if the Water District did not need to show that the IWAA was proportional to the cost of Canal Water delivery, the Water District has not tried to show that the IWAA was proportional to the proper measure: the benefits conferred on the properties by the IWAA. Moreover, the Water District can hardly be said to be caught by surprise by Howard Jarvis's IWAA challenge. The Water District's opposition brief during the liability phase spent several pages describing the IWAA and contesting

36

Howard Jarvis's IWAA arguments. We therefore find no error in Judge Sykes's IWAA ruling.[13]

### C. Remedies Rulings

We next consider the Water District's arguments relating to Judge Riemer's remedies rulings. The Water District contends that no refund relief is authorized for violations of Article XIII C, that alternatively the amount awarded was erroneous, and that the judgment erred in striking down the Class 1 rates and awarding overbroad injunctive relief. Except as to injunctive relief, we reject each of these contentions.

#### 1. Availability of Refund Relief

The Water District advances three arguments in claiming that no refund remedy was authorized. First, the Water District asserts that Article XIII, section 32 of the California Constitution imposes a "payment under protest" requirement that neither Roberts nor Howard Jarvis satisfied. Second, it asserts that if a refund statute applies, the relevant statute is Health and Safety Code section 5472, not, as Judge Riemer concluded, the Government Claims Act (Gov. Code § 810 et seq.). And third, the Water District argues no monetary damages should be available under the framework that our Supreme Court laid out in *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300 (*Katzberg*).

---

[13] During the remedies phase, Judge Riemer concluded that Class 2 customers would recover nothing for IWAAs. Howard Jarvis has not cross-appealed that ruling.

### a. *Payment Under Protest*

Article XIII, section 32 provides: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature." The "important public policy behind article XIII, section 32 "'is to allow revenue collection to continue during litigation so that essential public services dependent on the funds are not unnecessarily interrupted.""" (*Ardon v. City of Los Angeles* (2011) 52 Cal.4th 241, 252 (*Ardon*).) It thus prohibits predeprivation relief and limits taxpayers to postdeprivation relief only. (See *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Florida* (1990) 496 U.S. 18, 50 ["States have a legitimate interest in sound fiscal planning and . . . this interest is sufficiently weighty to allow States to withhold predeprivation relief for allegedly unlawful tax assessments, providing postdeprivation relief only."].)[14]

---

[14] We assume without deciding that Article XIII, section 32 applies to local governments. In *Ardon*, our Supreme Court did the same. (*Ardon*, *supra*, 52 Cal.4th at p. 252.) In an earlier case called *Howard Jarvis Taxpayers Ass'n v. City of La Habra* (2001) 25 Cal.4th 809 (*City of La Habra*), the Court stated in a footnote that Article XIII, section 32 bars "certain injunctive and writ relief in tax actions *against the State of California* and its officers" and that it does not apply against "local governments." (*City of La Habra*, at p. 822, fn. 5.) However, a few months after *City of La Habra*, the Court of Appeal, while citing *City of La Habra*, held that Article XIII, section 32 indeed applies to local governments. (*Flying Dutchman Park, Inc. v. City and County of San Francisco* (2001) 93 Cal.App.4th 1129, 1137 ["prepayment requirement for obtaining judicial review applies equally to local taxes as well as state taxes" "[b]ecause the wisdom of

38

The Water District's opening brief cites Article XIII, section 32, as well as caselaw addressing its scope. It then asserts, without explanation, that "[p]laintiffs did not pay under protest here." The Water District cites no authority, nor develops any argument, to show that the constitutional provision contains any "payment under protest" requirement. We therefore deem the argument waived. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

### b. Health and Safety Code Section 5472

The Water District next argues that Health and Safety Code section 5472 (section 5472) applies here and that Judge Riemer erred in concluding otherwise. Refund claims are permissible under the Government Claims Act "in the absence of a specific tax refund procedure" such as section 5472. (*Ardon*, *supra*, 52 Cal.4th at p. 253; see *McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 621 [listing section 5472 as an exception to the Government Claims Act].) If section 5472 does not apply, then the Government Claims Act's provisions do. Section 5472 does not apply.[15]

---

preventing the judiciary from interfering with tax schemes pertains as strongly to local taxes as it does to state taxes"].)

[15] The Water District asks that we take judicial notice of various published history materials pertaining to section 5472. It acknowledges cases noting that requests are not needed in such circumstances and that it does so out of an abundance of caution. We deny the request as unnecessary. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9 ["A request for judicial notice of published material is unnecessary. Citation to the material is sufficient."].)

In 1945, the Legislature enacted former Health and Safety Code section 5470, which provided that a "city or city and county" had the power to impose various exactions "for services and facilities furnished by it" in connection with its "sanitation or sewerage systems." (Former Health & Saf. Code, § 5470; see Stats. 1945, ch. 979, § 5, p. 1877, Stats. 1949, ch. 319, § 1, p. 608.) Two years later, in 1947, the Legislature extended such power to "[c]ounties, sanitary districts, county sanitation districts, and sewer maintenance districts." (Former Health & Saf. Code, § 5471; see Stats. 1947, ch. 1367, § 2, p. 2917.)

In 1949, the Legislature enacted the provision at issue, section 5472. (Stats. 1949, ch. 865, § 2, pp. 1638-1639.)[16] It provided that "[a]fter fees, rates, tolls, rentals or other charges are fixed pursuant to this article [i.e., Article 4 of the Health and Safety Code], any person may pay such fees, rates, tolls, rentals or other charges under protest and bring an action against the city or city and county in the superior court to recover any money which the legislative body refuses to refund." (§ 5472.) Thus, although cities, city and counties, counties, sanitary districts, county sanitation districts, and sewer maintenance districts may all impose what we will call Article 4 exactions, refund actions were limited to those "*against* the city or city and county" that had imposed one. (*Ibid.*, italics added.)

---

[16] A second Health and Safety Code section 5472 was added by a different statute in 1949. (Stats. 1949, ch. 1507, § 2, p. 2679.) That statute was renumbered as Health and Safety Code section 5472.5 in 1981. (Stats. 1981, ch. 714, § 221, p. 2679.) References to section 5472 are to the one enacted by chapter 865, and not chapter 1507, of the 1949 Statutes.

In 1953, the Legislature revised Article 4 of the Health and Safety Code. (Stats. 1953, ch. 862, pp. 2206-2210.) The revisions now gave "[a]ny *entity*" the power to impose Article 4 exactions. (Stats. 1953, ch. 862, § 1, p. 2206; italics added.) The new term "entity" was broadly defined to include "counties, cities and counties, cities, sanitary districts, county sanitation districts, sewer maintenance districts, and other public corporations and districts authorized to acquire, construct, maintain and operate sanitary sewers and sewerage systems." (Stats. 1953, ch. 862, § 2, p. 2207.) In effect, the revisions collapsed two definitional provisions (former Health & Safety Code sections 5470 and 5471) into a single term, and it expanded that term to include "other public corporations and districts authorized to acquire, construct, maintain and operate sanitary sewers and sewerage systems." However, no revisions were made to section 5472, which reads the same today as it did in 1949.

The Water District asserts that it is an "entity" (because it is a district "authorized to acquire, construct, maintain and operate sanitary sewers and sewerage systems") and that the Canal Water rates are Article 4 exactions. It then concludes that refunds are not permitted here because section 5472 expressly requires a person to first pay the exaction "under protest" and neither Roberts nor Howard Jarvis did so. It argues that the Legislature merely "overlooked" section 5472 when it revised Article 4 of the Health and Safety Code in 1953.

We disagree. Even if the Water District is an entity and that the Canal Water rates are Article 4 exactions, neither Roberts nor Howard Jarvis needed to pay Class 2 rates

41

"under protest" before initiating this refund suit. Section 5472 contemplates payment under protest only as a precursor to suits against a city or city and county that has imposed an Article 4 exaction. The Legislature has never expanded the section 5472 protest requirement to suits against other entities, even as the types of entities allowed to enact Article 4 exactions has expanded. Moreover, Article 4 of the Health and Safety Code has been amended several times in other respects since 1953. For instance, former Health and Safety Code section 5470, the provision enabling entities to impose Article 4 exactions, is now Health and Safety Code section 5471, and that section has been amended five times since 1953. (Stats. 1973, ch. 545, § 4, p. 1048; Stats. 1988, ch. 706, § 1, p. 2348; Stats. 1991, ch. 1110, § 35, p. 5286; Stats. 2007, ch. 27, § 11, p. 105; Stats. 2016, ch. 366, § 16.) In none of those instances, or in any others involving revisions to Article 4 of the Health and Safety Code, has the Legislature sought to remedy its supposed oversight regarding section 5472. "'The Legislature is presumed to be aware of all laws in existence when it passes or amends a statute.'" (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1039.) Additionally, the "failure to make changes in a given statute in a particular respect when the subject is before the Legislature, and changes are made in other respects, is indicative of an intention to leave the law unchanged in that respect." (*Kusior v. Silver* (1960) 54 Cal.2d 603, 618.) That the Legislature has not amended section 5472 indicates its intent to not require payment "under protest" in all suits against "entities."

Furthermore, following the plain meaning of section 5472 does not lead to absurd consequences. "When statutory language is ambiguous, we must follow its plain meaning ""'whatever may be thought of the wisdom, expediency, or policy of the act, even if it appears probable that a different object was in the mind of the legislature.'"" (*In re D.B.* (2014) 58 Cal.4th 941, 948.) "To justify departing from a literal reading of a clearly worded statute, the results produced must be so unreasonable the Legislature could not have intended them." (*Ibid.*) The Water District asserts that all water utilities need predictable finances and that our reading would frustrate that goal. However, the Legislature's decision to confine a protest requirement to suits against cities or cities and counties is not so unreasonable that it could not have been intended. This is especially true when, as here, a plaintiff submits a written claim under the Government Claims Act and thus "'enable[s] the public entity to engage in fiscal planning for potential liabilities.'" (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 738.) We therefore find no error in Judge Riemer's order finding that section 5472 does not apply. As a result, the Government Claims Act governs.

c.       *Constitutionality of Refund Relief*

The Water District contends that under *Katzberg*, no refund relief is available here. We granted a request by the League of California Cities, the Association of California Water Agencies, the California Special Districts Association, the California State Association of Counties, and the California Association of Sanitation Agencies to file an

43

amicus brief, which also argues that *Katzberg* precludes the refunds Judge Riemer awarded.

In *Katzberg*, our Supreme Court laid out the framework for determining whether an action for monetary damages may be maintained "to remedy an asserted constitutional violation." (*Katzberg*, *supra*, 29 Cal.4th at p. 317.) First, for the framework to apply at all, the asserted constitutional violation must not be "tied to an established common law or statutory action." (*Id.* at p. 303, fn. 1.) Then, if "no affirmative intent either to authorize or to withhold a damages remedy is found" from "the language and history of the constitutional provision at issue" "as well as any pertinent common law history," in determining whether damages are available to remedy a constitutional violation, a court is to consider "whether an adequate remedy exists, the extent to which a constitutional tort action would change established tort law, and the nature and significance of the constitutional provision." (*Id.* at p. 317.) If those factors favor recognition of a constitutional tort, then the court must also consider "the existence of any special factors counseling hesitation in recognizing a damages action, including deference to legislative judgment, avoidance of adverse policy consequences, considerations of government fiscal policy, practical issues of proof, and the competence of courts to assess particular

types of damages." (*Ibid.*; see also *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics Agents* (1971) 403 U.S. 388.)[17]

After initial briefing in this appeal was completed, our colleagues in the Fourth District, Division One decided *Coziahr v. Otay Water Dist.* (2024) 103 Cal.App.5th 785 (*Coziahr*). Addressing the *Katzberg* factors, *Coziahr* held that refunds are available for water rates imposed in violation of Proposition 218. (*Id.* at pp. 823-825.) The Water District requested leave to file a supplemental brief addressing *Coziahr*. We granted the request and invited Howard Jarvis and the amicus parties to file supplemental briefs as well.

The parties have not addressed it, so we do not consider the preliminary step of whether the action here is distinct enough from any "established common law or statutory action" (*Katzberg*, *supra*, 29 Cal.4th at p. 303, fn. 1). We nevertheless hold for a separate reason that the *Katzberg* framework does not apply to alleged violations of Propositions 218 or 26. In such cases, United States Supreme Court authority holds that refunds *must* be available. We thus agree with *Coziahr* that refunds are available, although we reach that conclusion through different means.

---

[17] *Katzberg* involved an asserted violation of the plaintiff's "due process liberty interests" under the California Constitution. (*Katzberg*, *supra*, 29 Cal.4th at p. 307.) The Court held that an action for damages was not available for such violations. In a companion case decided the same day, the Court reached a similar conclusion for cases alleging violations of the California Constitution's free speech clause. (*Degrassi v. Cook* (2002) 29 Cal. 4th 333, 335.)

In *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Department of Business Regulation of Florida*, *supra*, 496 U.S. 18 (*McKesson*), the petitioner alleged that Florida's liquor excise tax violated the Commerce Clause of the United States Constitution.  (*Id.* at p. 22.)  Although the Florida Supreme Court agreed that the tax unconstitutionally discriminated against interstate commerce, "the court also refused to provide petitioner a refund or any other form of relief for taxes it had already paid" under the tax.  (*Ibid.*)  The United States Supreme Court reversed, holding that when a state prohibits predeprivation tax relief, "the Due Process Clause requires the State to afford taxpayers a meaningful opportunity to secure postpayment relief for taxes already paid pursuant to a tax scheme ultimately found unconstitutional."  (*Ibid.*)

"Because exaction of a tax constitutes a deprivation of property, the State must provide procedural safeguards against unlawful exactions."  (*McKesson*, *supra*, 496 U.S. at p. 36.)  Although such safeguards typically take the form of a predeprivation hearing (see, e.g., *Mathews v. Eldridge* (1976) 424 U.S. 319, 333; *Cleveland Bd. of Educ. v. Loudermill* (1985) 470 U.S. 532, 542), "it is well established that a State need not provide predeprivation process for the exaction of taxes."  (*McKesson*, *supra*, at p. 37.)  However, if a state both prohibits predeprivation tax relief and denies "a meaningful opportunity to secure postpayment relief" (*id.* at p. 22), then the state violates the Due Process Clause of the United States Constitution.

The phrase "postpayment relief" may suggest that a state has wide discretion in choosing the form of relief for an unconstitutional tax. In practice, however, although a state "retains flexibility" in crafting relief (*McKesson*, *supra*, 496 U.S. at p. 39), it is all but constrained to providing a refund when no discriminatory tax is involved. In *McKesson*, where the Florida Supreme Court declared the tax unconstitutional "only insofar as it operated in a manner that discriminated against interstate commerce" (*ibid.*), the United States Supreme Court noted that Florida could (1) "cure the invalidity of the [tax] by refunding to petitioner the difference between" what it paid and what it would have paid had "the same rate reductions that its competitors actually received"; (2) "assess and collect back taxes from [the] petitioner's competitors who benefited from the rate reductions"; or (3) impose "a combination of a partial refund to petitioner and a partial retroactive assessment of tax increases on favored competitors." (*Id.* at pp. 40-41; see *Ceridian Corporation v. Franchise Tax Board* (2000) 85 Cal.App.4th 875, 888; *General Motors Corp. v. City & County of San Francisco* (1999) 69 Cal.App.4th 448, 452-456 [local government's proposed remedy for discriminatory tax did not satisfy *McKesson*].)

When there is no finding that a tax is discriminatory, however, there is no possibility of remedying a violation by retroactively imposing taxes on others. The government must thus refund the tax. *McKesson* left little room for doubt on this point. It stated: "Had the Florida courts declared the [tax] invalid either because (other than its discriminatory nature) it was beyond the State's power to impose, . . . or because the

taxpayers were absolutely immune from the tax, . . . no corrective action by the State could cure the invalidity of the tax during the contested tax period. The State *would have had no choice but to 'undo' the unlawful deprivation by refunding the tax* previously paid under duress, because allowing the State to 'collect these unlawful taxes by coercive means and not incur any obligation to pay them back . . . would be in contravention of the Fourteenth Amendment.'" (*McKesson*, *supra*, 496 U.S. at p. 39, italics added; see *Atchison, Topeka, & Santa Fe Railway Company v. O'Connor* (1912) 223 U.S. 280, 285 ["It is reasonable that a man who denies the legality of a tax should have a clear and certain remedy. The rule being established that, apart from special circumstances, he cannot interfere by injunction with the state's collection of its revenues, an action at law to recover back what he has paid is the alternative left."].)[18]

Here, Article XIII, section 32 prohibits predeprivation relief, as we have noted above. Moreover, the Class 2 rate is invalid not because it was discriminatory, but because it is a tax that was not approved by the applicable electorate.[19] As a result, no

---

[18] Contrary to what the Water District contended at oral argument, nothing in *McKesson* limits that case to taxes as the term is defined by federal law, assuming federal law has a generally applicable definition for the term to begin with. *McKesson* did not purport to apply any federal definition of "tax" to Florida's liquor excise tax.

[19] In her liability ruling, Judge Sykes concluded that the Class 2 rate rates did *not* violate equal protection, and Howard Jarvis has not cross-appealed.

matter what answer the *Katzberg* framework might yield, to avoid a violation of federal due process, Class 2 customers are entitled to a tax refund.[20]

### 2. *Amount of Relief*

The Water District contends that, even if refund relief is available, Judge Riemer erred in calculating the amount relief Class 2 customers should receive. We find no error.

In his August 2022 order, Judge Riemer ordered that the proper measure of relief would be the difference between what Class 2 customers paid and the rate they would have been charged had the cost of supplemental QSA water been allocated proportionally between Class 1 and Class 2 customers based on their relative Canal Water consumption, which we will refer to as the proportionally allocated rate. Whether a given measure of relief is permissible is subject to de novo review. (See *JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 583.) The Water District's view is that any refund should instead be "limited to the

---

[20] The Water District moved to strike portions of Howard Jarvis's answer to the amicus brief, and we reserved ruling. We now deny the motion and, as the Water District requested in the alternative, construe the motion as a surreply. (Cal. Rules of Court, rule 8.200(a)(4).)

In its surreply, the Water District contends that "no due process interest adheres" to utility rates such as water charges. This misunderstands what property is being protected by the due process guarantee here. It is the money the customers paid as a tax, not what payment of that money was intended to provide. (See *McKesson*, *supra*, 496 U.S. at p. 51 ["federal due process principles long recognized by our cases require the State's postdeprivation procedure to provide a 'clear and certain remedy' [citation] for the *deprivation of tax moneys* in an unconstitutional manner"], italics added.)

difference between the Class 2 rates paid and lawful rates." But the Water District never explains why the proportionally allocated rate is not a "lawful rate." Even if it is true that, as the Water District states, "Proposition 218 does not mandate that all canal users bear QSA supply costs alike," it does not follow that a rate reflecting those costs violates Proposition 218. It remains entirely possible—and the Water District has not shown otherwise—that a rate reflecting allocated supplemental QSA water costs is a lawful rate, even if other rates might be lawful as well. Accordingly, the Water District has not shown that the trial court erred in its measure of relief.

In substance, the Water District's position is that the refund should be the difference between the actual rate charged and its *preferred* rate, or what Judge Riemer characterized as "the maximum rates that could have been constitutionally imposed." The Water District contends that Judge Riemer should have allowed it to determine its preferred measure of damages, either by remanding to the Water District to allow it to determine a "lawful rate" or by allowing the Water District's experts to testify during the remedies phase of the trial. In essence, the Water District proposes an alternative measure of relief, which we will assume here would be a permissible measure of relief.

Unlike whether a measure of relief is permissible, a trial court's choice among multiple permissible measures is reviewed for abuse of discretion. (*JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.*, *supra*, 243 Cal.App.4th at p. 583.) "'"An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds

of reason and results in a miscarriage of justice. [Citations.] This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise."'" (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 378.)

We find no abuse of discretion here. In its remedies brief, the Water District argued, relying on opinions from its experts, that no refund should be awarded because the actual rates charged were in fact lawful rates. In his August 2022 order, Judge Riemer concluded that the Water District's position amounted to "a second bite of the apple" on liability. Noting that Judge Sykes had found the Water District "'made no attempt whatsoever to show'" that the Canal Water rates complied with either Proposition 218 or 26, Judge Riemer "decline[d] to give the district the chance in the remedies phase to do what it failed to do in the merits phrase."

The Water District fails to cite to the applicable standard of review here. It thus unsurprisingly does not contend that Judge Riemer abused his discretion. Instead, the Water District relies on cases where courts have remanded for additional factfinding on remedies. (See *County Sanitation Dist. No 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1624.) The Water District has not shown that Judge Riemer exceeded the bounds of reason by taking a different approach, or that he was compelled to remand for additional factfinding. We therefore find no error in the amount of refund relief awarded.

### 3. *Class 1 Rates*

In her liability ruling, Judge Sykes concluded there was no evidence "the Canal Water *rates*" fell under an exception to the term "tax" in Article XIII C. (Italics added.) During the remedies phase, the parties disputed whether the judgment should invalidate both the Class 1 and Class 2 rates or only the Class 2 rates. After reviewing the operative complaint and Judge Sykes's ruling, Judge Riemer concluded that Howard Jarvis's allegations encompassed both Class 1 and Class 2 rates and that the judgment would accordingly declare both to be invalid. The Water District argues this was in error because neither Roberts's initial claim nor the operative complaint alleged a violation of Class 1 rates. We find no error.

As the Water District correctly observes, Roberts's written claim focuses on only the Class 2 rates. It asserts, for example, that the "[i]mposition of Class 2 Canal Water rates on non-agricultural users is illegal," that "unlawful Class 2 Canal Water Rates were not approved by the voters as a tax," and that "any and all ordinances, resolutions or other acts which impose, extend, increase and/or enforce such unconstitutional Class 2 Canal Rates . . . should be declared void, voidable, invalid, unconstitutional and unenforceable." However, contrary to what the Water District asserts, there was no requirement that the written claim also attack the Class 1 rates, as Howard Jarvis did not seek money or damages relating to the Class 1 rates. Subject to exceptions not applicable here, Government Code section 905 requires the presentation of "all claims for money or damages against local public entities." "[N]o suit for money or damages may be brought

52

against a public entity on a cause of action for which a claim is required to be presented . . . until a written claim therefore has been presented to the public entity and has been acted upon . . . or has been deemed to have been rejected." (Gov. Code, § 945.4.) Because there was no claim for money or damages relating to the Class 1 rates, it did not matter that Roberts's written claim did not focus on Class 1 rates. (See also *Canova v. Trustees of Imperial Irrigation Dist. Employee Pension Plan* (2007) 150 Cal.App.4th 1487, 1493 [Government Claims Act does not apply "to nonpecuniary actions, 'such as those seeking injunctive, specific or declaratory relief"].)

As to the allegations in the operative complaint, they can be fairly read to have addressed both Class 1 and Class 2 rates. The complaint often uses the non-specific phrase "Canal Water rates." However, in its prayer for relief, the second amended petition and complaint specifically sought "any and all moneys that have been unlawfully and/or improperly collected as *'Class 2' Canal Water rates*" while also more generically seeking injunctive relief "in the collection and enforcement of the unlawful Canal Water rates." (Italics added.) That the prayer specifically confined monetary relief to one class of Canal Water rates suggests that the injunctive relief was not so limited. We therefore disagree with the Water District's contention that Howard Jarvis "never alleged" a violation of Class 1 rates. To the extent the Water District is arguing that the pleading was ambiguous, it waived the argument by not specially demurring on such ground. (Code Civ. Proc, §§ 430.10, subd. (f), 430.80; see *Ryan v. Jacques* (1894) 103 Cal. 280, 286 ["If a complaint or any allegation of a complaint is capable of different constructions,

53

that which the plaintiff gives it or which the court finds necessary to support the action will be given, in the absence of a special demurrer."].)

### 4. Injunctive Relief

Lastly, the Water District contends that Judge Riemer erred by including in the judgment paragraph 8, which states that "[a]ny Canal Water Rates and Charges, including IWAA charges, imposed by [the Water District] in the future shall comply with the requirements of Proposition 218." On this, we agree with the Water District.

In *City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 416, this court stated: "While a court may not issue a broad injunction to simply obey the law, thereby subjecting a person to contempt proceedings for committing at any time in the future some new violation unrelated to the original allegations, the court is entitled to restrain the person from committing similar or related unlawful activity." Proposition 218 added several sections to the California Constitution, many of which were not at issue here, yet the injunction exposes the Water District to contempt proceedings if any "Charge" (which the judgment does not specifically define) violates any portion of Proposition 218. Thus, in our view, the injunction enjoined behavior sufficiently "unrelated to the original allegations" such that it was overbroad.[21]

---

[21] Although Judge Riemer's January 2023 order stated that the Water District had agreed to the specific injunction here, we see no such agreement at the cited portion of the hearing transcript, and neither party addresses this in their briefs.

## III.  DISPOSITION

The judgment is modified to strike paragraph 8.  As modified, the judgment is affirmed.  Howard Jarvis is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION

RAPHAEL _____
J.

We concur:

RAMIREZ _____
P. J.

McKINSTER _____
J.